IMMIGRATION AND NATURALIZATION SERVICE
ET AL. *v.* DELGADO ET AL.

No. 82–1271.   Argued January 11, 1984—Decided April 17, 1984

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 221. POWELL, J., filed an opinion concurring in the result, *post*, p. 221. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 225.

*Deputy Solicitor General Frey* argued the cause for petitioners. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott, Elliott Schulder,* and *Patty Merkamp Stemler.*

*Henry R. Fenton* argued the cause for respondents. With him on the brief were *Gordon K. Hubel* and *Max Zimny.**

JUSTICE REHNQUIST delivered the opinion of the Court.

In the course of enforcing the immigration laws, petitioner Immigration and Naturalization Service (INS) enters employers' worksites to determine whether any illegal aliens

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union by *David M. Brodsky, Burt Neuborne,* and *Charles S. Sims;* and for the Mexican American Legal Defense and Education Fund, Inc., et al. by *Michael Kantor* and *Alan Diamond.*

may be present as employees. The Court of Appeals for the Ninth Circuit held that the "factory surveys" involved in this case amounted to a seizure of the entire work forces, and further held that the INS could not question individual employees during any of these surveys unless its agents had a reasonable suspicion that the employee to be questioned was an illegal alien. *International Ladies' Garment Workers' Union, AFL–CIO* v. *Sureck*, 681 F. 2d 624 (1982). We conclude that these factory surveys did not result in the seizure of the entire work forces, and that the individual questioning of the respondents in this case by INS agents concerning their citizenship did not amount to a detention or seizure under the Fourth Amendment. Accordingly, we reverse the judgment of the Court of Appeals.

Acting pursuant to two warrants, in January and September 1977, the INS conducted a survey of the work force at Southern California Davis Pleating Co. (Davis Pleating) in search of illegal aliens. The warrants were issued on a showing of probable cause by the INS that numerous illegal aliens were employed at Davis Pleating, although neither of the search warrants identified any particular illegal aliens by name. A third factory survey was conducted with the employer's consent in October 1977, at Mr. Pleat, another garment factory.

At the beginning of the surveys several agents positioned themselves near the buildings' exits, while other agents dispersed throughout the factory to question most, but not all, employees at their work stations. The agents displayed badges, carried walkie-talkies, and were armed, although at no point during any of the surveys was a weapon ever drawn. Moving systematically through the factory, the agents approached employees and, after identifying themselves, asked them from one to three questions relating to their citizenship. If the employee gave a credible reply that he was a United States citizen, the questioning ended, and the agent moved on to another employee. If the employee gave an unsatisfac-

tory response or admitted that he was an alien, the employee was asked to produce his immigration papers. During the survey, employees continued with their work and were free to walk around within the factory.

Respondents are four employees questioned in one of the three surveys.[1] In 1978 respondents and their union representative, the International Ladies Garment Workers' Union, filed two actions, later consolidated, in the United States District Court for the Central District of California challenging the constitutionality of INS factory surveys and seeking declaratory and injunctive relief. Respondents argued that the factory surveys violated their Fourth Amendment right to be free from unreasonable searches or seizures and the equal protection component of the Due Process Clause of the Fifth Amendment.

The District Court denied class certification and dismissed the union from the action for lack of standing, App. to Pet. for Cert. 58a–60a. In a series of cross-motions for partial summary judgment, the District Court ruled that respondents had no reasonable expectation of privacy in their workplaces which conferred standing on them to challenge entry by the INS pursuant to a warrant or owner's consent. *Id.*, at 49a–52a, 53a–55a, 56a–57a. In its final ruling the District Court addressed respondents' request for injunctive relief directed at preventing the INS from questioning them personally during any future surveys. The District Court, with no material facts in dispute, found that each of the four respondents was asked a question or questions by an INS agent during one of the factory surveys. *Id.*, at 46a. Reasoning from this Court's decision in *Terry* v. *Ohio*, 392 U. S. 1 (1968), that law enforcement officers may ask questions of anyone, the

---

[1] Respondents Herman Delgado, Ramona Correa, and Francisca Labonte worked at Davis Pleating, while Marie Miramontes, the fourth respondent, was employed by Mr. Pleat. Both Delgado and Correa are United States citizens, while Labonte and Miramontes are permanent resident aliens.

District Court ruled that none of the respondents had been detained under the Fourth Amendment during the factory surveys, either when they were questioned or otherwise. App. to Pet. for Cert. 47a. Accordingly, it granted summary judgment in favor of the INS.[2]

The Court of Appeals reversed. Applying the standard first enunciated by a Member of this Court in *United States* v. *Mendenhall*, 446 U. S. 544 (1980) (opinion of Stewart, J.), the Court of Appeals concluded that the entire work forces were seized for the duration of each survey, which lasted from one to two hours, because the stationing of agents at the doors to the buildings meant that "a reasonable worker 'would have believed that he was not free to leave.'" 681 F. 2d, at 634 (quoting *United States* v. *Anderson*, 663 F. 2d 934, 939 (CA9 1981)). Although the Court of Appeals conceded that the INS had statutory authority to question any alien or person believed to be an alien as to his right to be or remain in the United States, see 66 Stat. 233, 8 U. S. C. § 1357(a)(1), it further held that under the Fourth Amendment individual employees could be questioned only on the basis of a reasonable suspicion that a particular employee being questioned was an alien illegally in the country. 681 F. 2d, at 639–645. A reasonable suspicion or probable cause to believe that a number of illegal aliens were working at a particular factory site was insufficient to justify questioning any individual employee. *Id.*, at 643. Consequently, it also held that the individual questioning of respondents violated the Fourth Amendment because there had been no such reasonable suspicion or probable cause as to any of them.[3]

---

[2] The District Court never ruled directly on respondents' Fifth Amendment claim, apparently reasoning that since respondents' Fourth Amendment rights had not been violated, their Fifth Amendment right had also not been violated. The Court of Appeals also never ruled on respondents' Fifth Amendment claim, and we decline to do so.

[3] The Court of Appeals ruled that the District Court did not abuse its discretion in denying class certification. In light of its disposition of respondents' Fourth Amendment claims, the Court of Appeals declined to

We granted certiorari to review the decision of the Court of Appeals, 461 U. S. 904 (1983), because it has serious implications for the enforcement of the immigration laws and presents a conflict with the decision reached by the Third Circuit in *Babula* v. *INS*, 665 F. 2d 293 (1981).

The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 554 (1976). Given the diversity of encounters between police officers and citizens, however, the Court has been cautious in defining the limits imposed by the Fourth Amendment on encounters between the police and citizens. As we have noted elsewhere: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry* v. *Ohio, supra*, at 19, n. 16. While applying such a test is relatively straightforward in a situation resembling a traditional arrest, see *Dunaway* v. *New York*, 442 U. S. 200, 212–216 (1979), the protection against unreasonable seizures also extends to "seizures that involve only a brief detention short of traditional arrest." *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975). What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall, supra*, at 554 (footnote omitted); see *Florida* v. *Royer*, 460 U. S. 491, 502 (1983) (plurality opinion).

resolve the union's appeal from the District Court's determination that the union lacked standing to raise its members' Fourth Amendment claims. 681 F. 2d, at 645, n. 24.

Although we have yet to rule directly on whether mere questioning of an individual by a police official, without more, can amount to a seizure under the Fourth Amendment, our recent decision in *Royer, supra,* plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.   In *Royer,* when Drug Enforcement Administration agents found that the respondent matched a drug courier profile, the agents approached the defendant and asked him for his airplane ticket and driver's license, which the agents then examined.   A majority of the Court believed that the request and examination of the documents were "permissible in themselves."   *Id.,* at 501 (plurality opinion); see *id.,* at 523, n. 3 (opinion of REHNQUIST, J.).   In contrast, a much different situation prevailed in *Brown* v. *Texas,* 443 U. S. 47 (1979), when two policemen physically detained the defendant to determine his identity, after the defendant refused the officers' request to identify himself. The Court held that absent some reasonable suspicion of misconduct, the detention of the defendant to determine his identity violated the defendant's Fourth Amendment right to be free from an unreasonable seizure.   *Id.,* at 52.

What is apparent from *Royer* and *Brown* is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation.   While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.   Cf. *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 231–234 (1973).   Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.   But if the person refuses to answer and the police take additional steps—such as those taken in *Brown*— to obtain an answer, then the Fourth Amendment imposes

some minimal level of objective justification to validate the detention or seizure. *United States* v. *Mendenhall*, 446 U. S., at 554; see *Terry* v. *Ohio*, 392 U. S., at 21.

The Court of Appeals held that "the manner in which the factory surveys were conducted in this case constituted a seizure of the workforce" under the Fourth Amendment. 681 F. 2d, at 634. While the element of surprise and the systematic questioning of individual workers by several INS agents contributed to the court's holding, the pivotal factor in its decision was the stationing of INS agents near the exits of the factory buildings. According to the Court of Appeals, the stationing of agents near the doors meant that "departures were not to be contemplated," and thus, workers were "not free to leave." *Ibid.* In support of the decision below, respondents argue that the INS created an intimidating psychological environment when it intruded unexpectedly into the workplace with such a show of officers.[4] Besides the stationing of agents near the exits, respondents add that the length of the survey and the failure to inform workers they were free to leave resulted in a Fourth Amendment seizure of the entire work force.[5]

---

[4] Although the issue was the subject of substantial discussion at oral argument, the INS does not contest that respondents have standing to bring this case. They allege the existence of an ongoing policy which violated the Fourth Amendment and which will be applied to their workplace in the future. Cf. *Allee* v. *Medrano*, 416 U. S. 802 (1974). Part of their argument is clearly based on the INS's detention of illegal aliens found working at the two factories. Respondents, however, can only premise their right to injunctive relief on their individual encounters with INS agents during the factory surveys. See *infra*, at 221.

[5] Contrary to respondents' assertion, it also makes no difference in this case that the encounters took place inside a factory, a location usually not accessible to the public. The INS officers were lawfully present pursuant to consent or a warrant, and other people were in the area during the INS agents' questioning. Thus, the same considerations attending contacts between the police and citizens in public places should apply to the questions presented to the individual respondents here.

We reject the claim that the entire work forces of the two factories were seized for the duration of the surveys when the INS placed agents near the exits of the factory sites. Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers. The record indicates that when these surveys were initiated, the employees were about their ordinary business, operating machinery and performing other job assignments. While the surveys did cause some disruption, including the efforts of some workers to hide, the record also indicates that workers were not prevented by the agents from moving about the factories.

Respondents argue, however, that the stationing of agents near the factory doors showed the INS's intent to prevent people from leaving. But there is nothing in the record indicating that this is what the agents at the doors actually did. The obvious purpose of the agents' presence at the factory doors was to insure that all persons in the factories were questioned. The record indicates that the INS agents' conduct in this case consisted simply of questioning employees and arresting those they had probable cause to believe were unlawfully present in the factory. This conduct should have given respondents no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer. If mere questioning does not constitute a seizure when it occurs inside the factory, it is no more a seizure when it occurs at the exits.[6]

---

[6] In her deposition respondent Miramontes described an incident that occurred during the October factory survey at Mr. Pleat, in which an INS agent stationed by an exit attempted to prevent a worker, presumably an illegal alien, from leaving the premises after the survey started. The worker walked out the door and when an agent tried to stop him, the worker pushed the agent aside and ran away. App. 125–126. An ambiguous, isolated incident such as this fails to provide any basis on which to conclude that respondents have shown an INS policy entitling them to injunctive relief. See *Rizzo* v. *Goode*, 423 U. S. 362 (1976); cf. *Allee* v. *Medrano, supra; Hague* v. *CIO*, 307 U. S. 496 (1939).

A similar conclusion holds true for all other citizens or aliens lawfully present inside the factory buildings during the surveys. The presence of agents by the exits posed no reasonable threat of detention to these workers while they walked throughout the factories on job assignments. Likewise, the mere possibility that they would be questioned if they sought to leave the buildings should not have resulted in any reasonable apprehension by any of them that they would be seized or detained in any meaningful way. Since most workers could have had no reasonable fear that they would be detained upon leaving, we conclude that the work forces as a whole were not seized.[7]

The Court of Appeals also held that "detentive questioning" of individuals could be conducted only if INS agents could articulate "objective facts providing investigators with a reasonable suspicion that each questioned person, so detained, is an alien illegally in this country." 681 F. 2d, at 638. Under our analysis, however, since there was no seizure of the work forces by virtue of the method of conducting the factory surveys, the only way the issue of individual questioning could be presented would be if one of the named respondents had in fact been seized or detained. Reviewing the deposition testimony of respondents, we conclude that none were.

The questioning of each respondent by INS agents seems to have been nothing more than a brief encounter. None of the three Davis Pleating employees were questioned during the January survey. During the September survey at Davis Pleating, respondent Delgado was discussing the survey with another employee when two INS agents approached him and asked him where he was from and from what city. When Delgado informed them that he came from Mayaguez, Puerto

---

[7] Respondents Delgado and Labonte both left the building during the INS survey, Delgado to load a truck and Labonte to observe INS activities outside the building. App. 98, 136. Neither of them stated in their depositions that the INS agents in any way restrained them from leaving the building, or even addressed any questions to them upon leaving.

Rico, the agent made an innocuous observation to his partner and left. App. 94. Respondent Correa's experience in the September survey was similar. Walking from one part of the factory to another, Correa was stopped by an INS agent and asked where she was born. When she replied "Huntington Park, [California]," the agent walked away and Correa continued about her business. *Id.*, at 115. Respondent Labonte, the third Davis Pleating employee, was tapped on the shoulder and asked in Spanish, "Where are your papers?" *Id.*, at 138. Labonte responded that she had her papers and without any further request from the INS agents, showed the papers to the agents, who then left. Finally, respondent Miramontes, the sole Mr. Pleat employee involved in this case, encountered an agent en route from an office to her worksite. Questioned concerning her citizenship, Miramontes replied that she was a resident alien, and on the agent's request, produced her work permit. The agent then left. *Id.*, at 120–121.

Respondents argue that the manner in which the surveys were conducted and the attendant disruption caused by the surveys created a psychological environment which made them reasonably afraid they were not free to leave. Consequently, when respondents were approached by INS agents and questioned concerning their citizenship and right to work, they were effectively detained under the Fourth Amendment, since they reasonably feared that refusing to answer would have resulted in their arrest. But it was obvious from the beginning of the surveys that the INS agents were only questioning people. Persons such as respondents who simply went about their business in the workplace were not detained in any way; nothing more occurred than that a question was put to them. While persons who attempted to flee or evade the agents may eventually have been detained for questioning, see *id.*, at 50, 81–84, 91–93, respondents did not do so and were not in fact detained. The manner in which respondents were questioned, given its obvious purpose, could hardly result in a reasonable fear that respond-

ents were not free to continue working or to move about the factory. Respondents may only litigate what happened to them, and our review of their description of the encounters with the INS agents satisfies us that the encounters were classic consensual encounters rather than Fourth Amendment seizures. See *Florida* v. *Royer*, 460 U. S. 491 (1983); *United States* v. *Mendenhall*, 446 U. S. 544 (1980).

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE STEVENS, concurring.

A trial has not yet been held in this case. The District Court entered summary judgment against respondents, and the Court of Appeals, in reversing, did not remand the case for trial but rather directed the District Court to enter summary judgment for respondents and a permanent injunction against petitioners. As the case comes to us, therefore, we must construe the record most favorably to petitioners, and resolve all issues of fact in their favor. Because I agree that this record is insufficient to establish that there is no genuine issue of fact on the question whether any of the respondents could have reasonably believed that he or she had been detained in some meaningful way, I join the opinion of the Court.

JUSTICE POWELL, concurring in the result.

While the Court's opinion is persuasive, I find the question of whether the factory surveys conducted in this case resulted in any Fourth Amendment "seizures" to be a close one. The question turns on a difficult characterization of fact and law: whether a reasonable person in respondents' position would have believed he was free to refuse to answer the questions put to him by INS officers and leave the factory. I believe that the Court need not decide the question, however, because it is clear that any "seizure" that may have taken place was permissible under the reasoning of our decision in *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976).

In that case, we held that stopping automobiles for brief questioning at permanent traffic checkpoints away from the Mexican border is consistent with the Fourth Amendment and need not be authorized by a warrant.[1]  We assumed that the stops constituted "seizures" within the meaning of the Fourth Amendment, see *id.*, at 546, n. 1, 556, but upheld them as reasonable.  As in prior cases involving the apprehension of aliens illegally in the United States, we weighed the public interest in the practice at issue against the Fourth Amendment interest of the individual.  See *id.*, at 555. Noting the importance of routine checkpoint stops to controlling the flow of illegal aliens into the interior of the country, we found that the Government had a substantial interest in the practice.  On the other hand, the intrusion on individual motorists was minimal: the stops were brief, usually involving only a question or two and possibly the production of documents.  Moreover, they were public and regularized law enforcement activities vesting limited discretion in officers in the field.  Weighing these considerations, we held that the stops and questioning at issue, as well as referrals to a slightly longer secondary inspection, might be made "in the absence of any individualized suspicion" that a particular car contained illegal aliens, *id.*, at 562.

This case is similar.  The Government's interest in using factory surveys is as great if not greater.  According to an affidavit by the INS's Assistant District Director in Los Angeles contained in the record in this case, the surveys account for one-half to three-quarters of the illegal aliens identified and arrested away from the border every day in the Los Angeles District.  App. 47.[2]  In that District alone, over

---

[1] This case presents no question as to whether a warrant was required for the entry by the INS officers into the plants.  As the majority notes, the INS obtained either a warrant or consent from the factory owners before entering the plants to conduct the surveys.

[2] The Solicitor General informs us that the figure in text refers to 1977. For the country as a whole, the INS estimates from its internal records that factory surveys accounted in 1982 for approximately 60% of all illegal

20,000 illegal aliens were arrested in the course of factory surveys in one year. *Id.*, at 44. The surveys in this case resulted in the arrest of between 20% and 50% of the employees at each of the factories.[3]

We have noted before the dimensions of the immigration problem in this country. *E. g., United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878–879 (1975); *Martinez-Fuerte, supra*, at 551–553. Recent estimates of the number of illegal aliens in this country range between 2 and 12 million, although the consensus appears to be that the number at any one time is between 3 and 6 million.[4] One of the main reasons they come—perhaps *the* main reason—is to seek employment. See App. 43; *Martinez-Fuerte, supra*, at 551; Select Committee, at 25, 38. Factory surveys strike directly at this cause, enabling the INS with relatively few agents to diminish the incentive for the dangerous passage across the border and to apprehend large numbers of those who come. Clearly, the Government interest in this enforcement technique is enormous.[5]

aliens apprehended by the INS in nonborder locations. Brief for Petitioners 3–4, and n. 3.

[3] During the course of the the first survey at Davis Pleating, 78 illegal aliens were arrested out of a work force of approximately 300. The second survey nine months later resulted in the arrest of 39 illegal aliens out of about 200 employees. The survey at Mr. Pleat resulted in the arrest of 45 illegal aliens out of approximately 90 employees. App. 51.

[4] House Select Committee on Population, 95th Cong., 2d Sess., Legal and Illegal Immigration to the United States 2, 16–17 (Comm. Print 1978) (hereinafter Select Committee); see also *Brignoni-Ponce*, 422 U. S., at 878 (the INS in 1974 suggested that the number of illegal aliens might be as high as 10 to 12 million).

[5] Despite the vast expenditures by the INS and other agencies to prevent illegal immigration and apprehend aliens illegally in the United States, and despite laws making it a crime for them to be here, our law irrationally continues to permit United States employers to hire them. Many employers actively recruit low-paid illegal immigrant labor, encouraging—with Government tolerance—illegal entry into the United States. See Select Committee, at 25. This incongruity in our immigration statutes is not calculated to increase respect for the rule of law.

The intrusion into the Fourth Amendment interests of the employees, on the other hand, is about the same as it was in *Martinez-Fuerte*. The objective intrusion is actually less: there, cars often were stopped for up to five minutes, while here employees could continue their work as the survey progressed. They were diverted briefly to answer a few questions or to display their registration cards. It is true that the initial entry into the plant in a factory survey is a surprise to the workers, but the obviously authorized character of the operation, the clear purpose of seeking illegal aliens, and the systematic and public nature of the survey serve to minimize any concern or fright on the part of lawful employees. Moreover, the employees' expectation of privacy in the plant setting here, like that in an automobile, certainly is far less than the traditional expectation of privacy in one's residence. Therefore, for the same reasons that we upheld the checkpoint stops in *Martinez-Fuerte* without any individualized suspicion, I would find the factory surveys here to be reasonable.[6]

---

[6] The Court in *Martinez-Fuerte* also held that no particularized reason was necessary to refer motorists to the secondary inspection area for a slightly more intrusive "seizure." 428 U. S., at 563–564. Similarly, I would hold in this case that in the context of an overall survey of a factory, no particularized suspicion is needed to justify the choice of those employees who are subjected to the minimal intrusion of the questioning here. The dissent's claim that INS agents have greater discretion to decide whom to question in factory surveys than they do at traffic checkpoints, *post*, at 237–238, neglects the virtually unlimited discretion to refer cars to the secondary inspection area that we approved in *Martinez-Fuerte*.

The dissent also suggests that a warrant requirement for factory surveys, and certain unspecified improvements, would make the surveys constitutional. *Post*, at 239. I note only that the Court in *Martinez-Fuerte* declined to impose a warrant requirement on the location of traffic checkpoints, 428 U. S., at 564–566, and that the respondents here do not argue for such a requirement or for changes in the "duration and manner" of the surveys. I would not address the warrant question until it is fully briefed by both sides.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

As part of its ongoing efforts to enforce the immigration laws, the Immigration and Naturalization Service (INS) conducts "surveys" of those workplaces that it has reason to believe employ large numbers of undocumented aliens who may be subject to deportation. This case presents the question whether the INS's method of carrying out these "factory surveys"[1] violates the rights of the affected factory workers to be secure against unreasonable seizures of one's person as guaranteed by the Fourth Amendment. Answering that question, the Court today holds, first, that the INS surveys involved here did not result in the seizure of the entire factory work force for the complete duration of the surveys, *ante*, at 218–219, and, second, that the individual questioning of respondents by INS agents concerning their citizenship did not constitute seizures within the meaning of the Fourth Amendment, *ante*, at 219–221. Although I generally agree with the Court's first conclusion,[2] I am convinced that a fair application of our prior decisions to the facts of this case

---

[1] The enforcement activities of the INS are divided between "border patrol" operations conducted along the border and its functional equivalents and "area control" operations conducted in the interior of the United States. The INS's area control operations are in turn divided into traffic control operations (such as maintaining fixed checkpoints on major highways) and factory surveys of the kind at issue in this case.

[2] It seems to me that the Court correctly finds that there was no single continuing seizure of the entire work force from the moment that the INS agents first secured the factory exits until the completion of the survey. I join the Court's judgment in this respect because it is apparent that in all three factory surveys under review most of the employees were generally free while the survey was being conducted to continue working without interruption and to move about the workplace. Having said that, however, I should emphasize that I find the evidence concerning the conduct of the factorywide survey highly relevant to determining whether the individual respondents were seized. See *infra*, at 229–231.

compels the conclusion that respondents were unreasonably seized by INS agents in the course of these factory surveys.

At first blush, the Court's opinion appears unremarkable. But what is striking about today's decision is its studied air of unreality. Indeed, it is only through a considerable feat of legerdemain that the Court is able to arrive at the conclusion that the respondents were not seized. The success of the Court's sleight of hand turns on the proposition that the interrogations of respondents by the INS were merely brief, "consensual encounters," *ante*, at 221, that posed no threat to respondents' personal security and freedom. The record, however, tells a far different story.

I

Contrary to the Court's suggestion, see *ante*, at 216, we have repeatedly considered whether and, if so, under what circumstances questioning of an individual by law enforcement officers may amount to a seizure within the meaning of the Fourth Amendment. See, *e. g.*, *Terry* v. *Ohio*, 392 U. S. 1 (1968); *Davis* v. *Mississippi*, 394 U. S. 721 (1969); *Adams* v. *Williams*, 407 U. S. 143 (1972); *Brown* v. *Texas*, 443 U. S. 47 (1979); *United States* v. *Mendenhall*, 446 U. S. 544 (1980); *Florida* v. *Royer*, 460 U. S. 491 (1983). Of course, as these decisions recognize, the question does not admit of any simple answer. The difficulty springs from the inherent tension between our commitment to safeguarding the precious, and all too fragile, right to go about one's business free from unwarranted government interference, and our recognition that the police must be allowed some latitude in gathering information from those individuals who are willing to cooperate. Given these difficulties, it is perhaps understandable that our efforts to strike an appropriate balance have not produced uniform results. Nevertheless, the outline of what appears to be the appropriate inquiry has been traced over the years with some clarity.

The Court launched its examination of this issue in *Terry* v. *Ohio, supra,* by explaining that "the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. *It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.*" *Id.,* at 16 (emphasis added). Such a seizure, the Court noted, may be evidenced by either "physical force or show of authority" indicating that the individual's liberty has been restrained. *Id.,* at 19, n. 16. The essential teaching of the Court's decision in *Terry*—that an individual's right to personal security and freedom must be respected even in encounters with the police that fall short of full arrest—has been consistently reaffirmed. In *Davis* v. *Mississippi,* 394 U. S., at 726–727, for example, the Court confirmed that investigatory detentions implicate the protections of the Fourth Amendment and further explained that "while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer." *Id.,* at 727, n. 6. Similarly, in *Brown* v. *Texas, supra,* we overturned a conviction for refusing to stop and identify oneself to police, because, in making the stop, the police lacked any "reasonable suspicion, based on objective facts, that the individual [was] involved in criminal activity." *Id.,* at 51. The animating principle underlying this unanimous decision was that the Fourth Amendment protects an individual's personal security and privacy from unreasonable interference by the police, even when that interference amounts to no more than a brief stop and questioning concerning one's identity.

Although it was joined at the time by only one other Member of this Court, Part II–A of Justice Stewart's opinion in *United States* v. *Mendenhall, supra,* offered a helpful, preliminary distillation of the lessons of these cases. Noting

first that "as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy," Justice Stewart explained that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.*, at 554. The opinion also suggested that such circumstances might include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Ibid.*

A majority of the Court has since adopted that formula as the appropriate standard for determining when inquiries made by the police cross the boundary separating merely consensual encounters from forcible stops to investigate a suspected crime. See *Florida* v. *Royer*, 460 U. S., at 502, (plurality opinion); *id.*, at 511–512 (BRENNAN, J., concurring in result); *id.*, at 514 (BLACKMUN, J., dissenting). This rule properly looks not to the subjective impressions of the person questioned but rather to the objective characteristics of the encounter which may suggest whether or not a reasonable person would believe that he remained free during the course of the questioning to disregard the questions and walk away. See 3 W. LaFave, Search and Seizure § 9.2, p. 52 (1978). The governing principles that should guide us in this difficult area were summarized in the *Royer* plurality opinion:

> "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, con-

vert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. *He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.*" 460 U. S., at 497–498 (citations omitted) (emphasis added).

Applying these principles to the facts of this case, I have no difficulty concluding that respondents were seized within the meaning of the Fourth Amendment when they were accosted by the INS agents and questioned concerning their right to remain in the United States. Although none of the respondents was physically restrained by the INS agents during the questioning, it is nonetheless plain beyond cavil that the manner in which the INS conducted these surveys demonstrated a "show of authority" of sufficient size and force to overbear the will of any reasonable person. Faced with such tactics, a reasonable person could not help but feel compelled to stop and provide answers to the INS agents' questions. The Court's efforts to avoid this conclusion are rooted more in fantasy than in the record of this case. The Court goes astray, in my view, chiefly because it insists upon considering each interrogation in isolation as if respondents had been questioned by the INS in a setting similar to an encounter between a single police officer and a lone passerby that might occur on a street corner. Obviously, once the Court begins with such an unrealistic view of the facts, it is only a short step to the equally fanciful conclusion that respondents acted voluntarily when they stopped and answered the agents' questions.

The surrounding circumstances in this case are far different from an isolated encounter between the police and a passerby on the street. Each of the respondents testified at length about the widespread disturbance among the workers

that was sparked by the INS surveys and the intimidating atmosphere created by the INS's investigative tactics.   First, as the respondents explained, the surveys were carried out by surprise by relatively large numbers of agents, generally from 15 to 25, who moved systematically through the rows of workers who were seated at their work stations.   See App. 77–78, 81–85, 102–103, 122–123.   Second, as the INS agents discovered persons whom they suspected of being illegal aliens, they would handcuff these persons and lead them away to waiting vans outside the factory.   See *id.*, at 88, 140–141.   Third, all of the factory exits were conspicuously guarded by INS agents, stationed there to prevent anyone from leaving while the survey was being conducted.   See *id.*, at 48, 82, 125–126, 144–145, 158.   Finally, as the INS agents moved through the rows of workers, they would show their badges and direct pointed questions at the workers.   In light of these circumstances, it is simply fantastic to conclude that a reasonable person could ignore all that was occurring throughout the factory and, when the INS agents reached him, have the temerity to believe that he was at liberty to refuse to answer their questions and walk away.

Indeed, the experiences recounted by respondents clearly demonstrate that they did not feel free either to ignore the INS agents or to refuse to answer the questions posed to them.   For example, respondent Delgado, a naturalized American citizen, explained that he was standing near his work station when two INS agents approached him, identified themselves as immigration officers, showed him their badges, and asked him to state where he was born.   *Id.*, at 95.   Delgado, of course, had seen all that was going on around him up to that point and naturally he responded.   As a final reminder of who controlled the situation, one INS agent remarked as they were leaving Delgado that they would be coming back to check him out again because he spoke English too well.   *Id.*, at 94.   Respondent Miramontes described her encounter with the INS in similar terms: "He

told me he was from Immigration, so when I showed him the [work permit] papers I saw his badge. *If I hadn't* [seen his badge], *I wouldn't have shown them to him.*" *Id.*, at 121 (emphasis added). She further testified that she was frightened during this interview because "normally you get nervous when you see everybody is scared, everybody is nervous." *Ibid.* Respondent Labontes testified that while she was sitting at her machine an immigration officer came up to her from behind, tapped her on the left shoulder and asked "Where are your papers?" Explaining her response to this demand, she testified: "I turned, *and at the same time I didn't wish to identify myself.* When I saw [the INS agents], I said, 'Yes, yes, I have my papers.'" *Id.*, at 138 (emphasis added).

In sum, it is clear from this testimony that respondents felt constrained to answer the questions posed by the INS agents, even though they did not wish to do so. That such a feeling of constraint was reasonable should be beyond question in light of the surrounding circumstances. Indeed, the respondents' testimony paints a frightening picture of people subjected to wholesale interrogation under conditions designed not to respect personal security and privacy, but rather to elicit prompt answers from completely intimidated workers. Nothing could be clearer than that these tactics amounted to seizures of respondents under the Fourth Amendment.[3]

---

[3] Although respondents insist that the circumstances of these interrogations were sufficiently coercive to constitute a "seizure" under the Fourth Amendment, they do not contend that these interviews were conducted under conditions that might be labeled "custodial"; they do not argue, therefore, that the questioning by INS agents posed any threat to the privilege against self-incrimination protected by the Fifth Amendment. Cf. *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Accordingly, it is not necessary to consider whether INS agents should be required to warn respondents of the possible incriminating consequences of providing answers to the agents' questions.

## II

The Court's eagerness to conclude that these interrogations did not represent seizures is to some extent understandable, of course, because such a conclusion permits the Court to avoid the imposing task of justifying these seizures on the basis of reasonable, objective criteria as required by the Fourth Amendment.

The reasonableness requirement of the Fourth Amendment applies to all seizures of the person, including those that involve only a brief detention short of traditional arrest. But because the intrusion upon an individual's personal security and privacy is limited in cases of this sort, we have explained that brief detentions may be justified on "facts that do not amount to the probable cause required for an arrest." *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 880 (1975). Nevertheless, our prior decisions also make clear that investigatory stops of the kind at issue here "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States* v. *Cortez,* 449 U. S. 411, 417 (1981). As the Court stated in *Terry,* the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." 392 U. S., at 21, n. 18. Repeatedly, we have insisted that police may not detain and interrogate an individual unless they have reasonable grounds for suspecting that the person is involved in some unlawful activity. In *United States* v. *Brignoni-Ponce, supra,* for instance, the Court held that "[Border Patrol] officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.,* at 884. See also *Michigan* v. *Summers,* 452 U. S. 692, 699–700 (1981); *Ybarra* v. *Illinois,* 444 U. S. 85, 92–93 (1979); *Brown* v. *Texas,* 443 U. S., at 51–52; *Dela-*

*ware* v. *Prouse,* 440 U. S. 648, 661 (1979); *Adams* v. *Williams,* 407 U. S., at 146–149; *Davis* v. *Mississippi,* 394 U. S., at 726–728; *Terry* v. *Ohio,* 392 U. S., at 16–19. This requirement of particularized suspicion provides the chief protection of lawful citizens against unwarranted governmental interference with their personal security and privacy.

In this case, the individual seizures of respondents by the INS agents clearly were neither "based on specific, objective facts indicating that society's legitimate interests require[d] the seizure," nor "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown* v. *Texas, supra,* at 51. It is undisputed that the vast majority of the undocumented aliens discovered in the surveyed factories had illegally immigrated from Mexico. Nevertheless, the INS agents involved in this case apparently were instructed, in the words of the INS Assistant District Director in charge of the operations, to interrogate "virtually all persons employed by a company." App. 49. See also *id.,* at 77, 85–86, 151–152, 155. Consequently, all workers, irrespective of whether they were American citizens, permanent resident aliens, or deportable aliens, were subjected to questioning by INS agents concerning their right to remain in the country. By their own admission, the INS agents did not selectively question persons in these surveys on the basis of any reasonable suspicion that the persons were illegal aliens. See *id.,* at 55, 155. That the INS policy is so indiscriminate should not be surprising, however, since many of the employees in the surveyed factories who are lawful residents of the United States may have been born in Mexico, have a Latin appearance, or speak Spanish while at work. See *id.,* at 57, 73. What this means, of course, is that the many lawful workers who constitute the clear majority at the surveyed workplaces are subjected to surprise questioning under intimidating circumstances by INS agents who have no reasonable basis for suspecting that they have

done anything wrong. To say that such an indiscriminate policy of mass interrogation is constitutional makes a mockery of the words of the Fourth Amendment.

Furthermore, even if the INS agents had pursued a firm policy of stopping and interrogating only those persons whom they reasonably suspected of being *aliens*, they would still have failed, given the particular circumstances of this case, to safeguard adequately the rights secured by the Fourth Amendment. The first and in my view insurmountable problem with such a policy is that, viewed realistically, it poses such grave problems of execution that in practice it affords virtually no protection to lawful American citizens working in these factories. This is so because, as the Court recognized in *Brignoni-Ponce, supra,* at 886, there is no reliable way to distinguish with a reasonable degree of accuracy between native-born and naturalized citizens of Mexican ancestry on the one hand, and aliens of Mexican ancestry on the other.[4] See also Developments, Immigration Policy and the Rights of Aliens, 96 Harv. L. Rev. 1286, 1374–1375 (1983). Indeed, the record in this case clearly demonstrates this danger, since respondents Correa and Delgado, although both American citizens, were subjected to questioning during the INS surveys.

---

[4] As we explained in *Brignoni-Ponce:* "Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens." 422 U. S. at 886.

Indeed, the proposition that INS agents, even those who have considerable experience in the field, will be able fairly and accurately to distinguish between Spanish-speaking persons of Mexican ancestry who are either native-born or naturalized citizens, and Spanish-speaking persons of Mexican ancestry who are aliens is both implausible and subject to discriminatory abuse. The protection of fundamental constitutional rights should not depend upon such unconstrained administrative discretion, for, as we have often observed, "[w]hen . . . a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." *Brown* v. *Texas,* 443 U. S. 47, 52 (1979).

Moreover, the mere fact that a person is believed to be an alien provides no immediate grounds for suspecting any illegal activity. Congress, of course, possesses broad power to regulate the admission and exclusion of aliens, see *Kliendeinst* v. *Mandel*, 408 U. S. 753, 766 (1972); *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977), and resident aliens surely may be required to register with the INS and to carry proper identification, see 8 U. S. C. §§ 1302, 1304(e). Nonetheless, as we held in *Brignoni-Ponce*, 422 U. S., at 883–884, when the Executive Branch seeks to enforce such congressional policies, it may not employ enforcement techniques that threaten the constitutional rights of American citizens. In contexts such as these factory surveys, where it is virtually impossible to distinguish fairly between citizens and aliens, the threat to vital civil rights of American citizens would soon become intolerable if we simply permitted the INS to question persons solely on account of suspected alienage. Cf. *id.*, at 884–886. Therefore, in order to protect both American citizens and lawful resident aliens, who are also protected by the Fourth Amendment, see *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 273 (1973), the INS must tailor its enforcement efforts to focus only on those workers who are reasonably suspected of being illegal aliens.[5]

---

[5] Of course, as the Government points out, see Brief for Petitioners 35–38, § 287(a)(1) of the Immigration and Nationality Act provides that INS officers may, without a warrant, "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 66 Stat. 233, 8 U. S. C. § 1357(a)(1). We have held, however, that broad statutory authority of this kind does not license the INS to employ unconstitutional enforcement methods. *Almeida-Sanchez* v. *United States*, 413 U. S., at 272–273. Because of that concern, the Court in *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975), expressly left open the question whether INS officers "may stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country." *Id.*, at 884, n. 9. In my view, given the particular constitutional dangers posed by the INS's present method of carrying out factory surveys, the exercise of the authority granted by § 287(a)(1) must be limited to interrogations of only those persons reasonably believed to be in the country illegally.

Relying upon *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976), however, JUSTICE POWELL would hold that the interrogation of respondents represented a "reasonable" seizure under the Fourth Amendment, even though the INS agents lacked any particularized suspicion of illegal alienage to support the questioning, *ante*, at 224. In my view, reliance on that decision is misplaced. In *Martinez-Fuerte*, the Court held that when the intrusion upon protected privacy interests is extremely limited, the INS, in order to serve the pressing governmental interest in immigration enforcement, may briefly detain travelers at fixed checkpoints for questioning solely on the basis of "apparent Mexican ancestry." 428 U. S., at 563. In so holding, the Court was careful to distinguish its earlier decision in *Brignoni-Ponce, supra*, which held that Border Patrol agents conducting roving patrols may not stop and question motorists solely on the basis of apparent Mexican ancestry, and may instead make such stops only when their observations lead them "reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country." *Id.*, at 881. The "crucial distinction" between the roving patrols and the fixed checkpoints, as the Court later observed in *Delaware* v. *Prouse*, 440 U. S., at 656, was "the lesser intrusion upon the motorist's Fourth Amendment interests" caused by the checkpoint operations. Thus, as the Court explained in *Martinez-Fuerte:* "This objective intrusion—the stop itself, the questioning, and the visual inspection—also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." 428 U. S., at 558.[6]

---

[6] Indeed, in *Martinez-Fuerte*, the Court repeatedly emphasized that, in contrast to the roving patrol stops, the fixed checkpoint operations are less likely to frighten motorists. This was so because "[m]otorists using these highways are not taken by surprise as they know . . . the location of the

The limited departure from *Terry's* general requirement of particularized suspicion permitted in *Martinez-Fuerte* turned, therefore, largely on the fact that the intrusion upon motorists resulting from the checkpoint operations was extremely modest. In this case, by contrast, there are no equivalent guarantees that the privacy of lawful workers will not be substantially invaded by the factory surveys or that the workers will not be frightened by the INS tactics. Indeed, the opposite is true. First, unlike the fixed checkpoints that were upheld in *Martinez-Fuerte* in part because their location was known to motorists in advance, the INS factory surveys are sprung upon unsuspecting workers completely by surprise. Respondents testified that the sudden arrival of large numbers of INS agents created widespread fear and anxiety among most workers. See App. 89, 107, 116, 120–121, 129–130. Respondent Miramontes, for instance, explained that she was afraid during the surveys "[b]ecause if I leave and they think I don't have no papers and they shoot me or something. They see me leaving and they think I'm guilty." *Id.*, at 127.[7] In *Martinez-Fuerte*, there was absolutely no evidence of widespread fear and anxiety similar to that adduced in this case.

Second, the degree of unfettered discretionary judgment exercised by the individual INS agents during the factory surveys is considerably greater than in the fixed checkpoint operations. The power of individual INS agents to decide who they will stop and question and who they will pass over contributes significantly to the feeling of uncertainty and

---

checkpoints and will not be stopped elsewhere," and because the operations "both appear to and actually involve less discretionary enforcement activity." 428 U. S., at 559.

[7] See also United States Commission on Civil Rights, The Tarnished Golden Door: Civil Rights Issues in Immigration 90–91 (1980) (noting that "[t]estimony received by the Commission indicates that . . . INS area control operations do cause confusion and pandemonium among all factory employees, thereby disrupting a factory's operations and decreasing production").

anxiety of the workers.  See App. 86, 90, 129–130.  Unlike the fixed checkpoint operation, there can be no reliable sense among the affected workers that the survey will be conducted in an orderly and predictable manner.  Third, although the workplace obviously is not as private as the home, it is at the same time not without an element of privacy that is greater than in an automobile.  All motorists expect that while on the highway they are subject to general police surveillance as part of the regular and expectable enforcement of traffic laws.  For the average employee, however, the workplace encloses a small, recognizable community that is a locus of friendships, gossip, common effort, and shared experience.  While at work, therefore, the average employee will not have the same sense of anonymity that is felt when one is driving on the public highways; instead, an employee will be known by co-workers and will recognize other employees as his or her fellows.  This experience, common enough among all who work, forms the basis for a legitimate, albeit modest, expectation of privacy that cannot be indiscriminately invaded by government agents.  See *Mancusi* v. *DeForte*, 392 U. S. 364, 368–369 (1968) (employee has reasonable expectation of privacy in office space shared with other workers).  The mere fact that the employer has consented to the entry of the INS onto his property does not mean that the workers' expectation of privacy evaporates.

Finally, there is no historical precedent for these kinds of surveys that would make them expectable or predictable.  As the Court noted in *Martinez-Fuerte, supra,* at 560–561, n. 14, road checkpoints are supported to some extent by a long history of acceptance that diminishes substantially the concern and fear that such practices would elicit in the average motorist.  But factory surveys of the kind conducted by the INS are wholly unprecedented, and their novelty can therefore be expected to engender a high degree of resentment and anxiety.  In sum, although the governmental interest is obviously as substantial here as it was in *Martinez-*

*Fuerte*, the degree of intrusion upon the privacy rights of lawful workers is significantly greater. Accordingly, the quantum of suspicion required to justify such an intrusion must be correspondingly greater.

In my view, therefore, the only acceptable alternatives that would adequately safeguard Fourth Amendment values in this context are for the INS either (a) to adopt a firm policy of stopping and questioning only those workers who are reasonably suspected of being illegal aliens, or (b) to develop a factory survey program that is predictably and reliably less intrusive than the current scheme under review. The first alternative would satisfy the requirement of particularized suspicion enunciated in *Terry*—a principle that must control here because the specific conditions that permitted exception to that requirement in *Martinez-Fuerte* are simply not present. The second alternative would seek to redesign the factory survey techniques used by the INS in order to bring them more closely into line with the characteristics found in *Martinez-Fuerte*. Such a scheme might require the INS, before conducting a survey of all workers in a particular plant, to secure an administrative warrant based upon a showing that reasonable grounds exist for believing that a substantial number of workers employed at the factory are undocumented aliens subject to deportation, and that there are no practical alternatives to conducting such a survey. Cf. *Camara* v. *Municipal Court*, 387 U. S. 523 (1967). In addition, the surveys could be further tailored in duration and manner so as to be substantially less intrusive.

III

No one doubts that the presence of large numbers of undocumented aliens in this country creates law enforcement problems of titanic proportions for the INS. Nor does anyone question that this agency must be afforded considerable latitude in meeting its delegated enforcement responsibilities. I am afraid, however, that the Court has become so

mesmerized by the magnitude of the problem that it has too easily allowed Fourth Amendment freedoms to be sacrificed. Before we discard all efforts to respect the commands of the Fourth Amendment in this troubling area, however, it is worth remembering that the difficulties faced by the INS today are partly of our own making.

The INS methods under review in this case are, in my view, more the product of expedience than of prudent law enforcement policy. The Immigration and Nationality Act establishes a quota-based system for regulating the admission of immigrants to this country which is designed to operate primarily at our borders. See 8 U. S. C. §§ 1151–1153, 1221–1225. See generally Developments, 96 Harv. L. Rev., at 1334–1369. With respect to Mexican immigration, however, this system has almost completely broken down. This breakdown is due in part, of course, to the considerable practical problems of patroling a 2,000-mile border; it is, however, also the result of our failure to commit sufficient resources to the border patrol effort. See Administration's Proposals on Immigration and Refugee Policy: Joint Hearing before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, and the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 6 (1981) (statement of Attorney General Smith); see also Developments, 96 Harv. L. Rev., at 1439. Furthermore, the Act expressly exempts American businesses that employ undocumented aliens from all criminal sanctions, 8 U. S. C. § 1324(a), thereby adding to the already powerful incentives for aliens to cross our borders illegally in search of employment.[8]

---

[8] The enormous law enforcement problems resulting from this combination of practical difficulties in patrolling this border and the incentives for illegal aliens to secure employment have been noted by the Congress, see Hearings on Oversight of the Immigration and Naturalization Service before the Subcommittee on Immigration, Citizenship and International

In the face of these facts, it seems anomalous to insist that the INS must now be permitted virtually unconstrained discretion to conduct wide-ranging searches for undocumented aliens at otherwise lawful places of employment in the *interior* of the United States. What this position amounts to, I submit, is an admission that since we have allowed border enforcement to collapse and since we are unwilling to require American employers to share any of the blame, we must, as a matter of expediency, visit all of the burdens of this jury-rigged enforcement scheme on the privacy interests of completely lawful citizens and resident aliens who are subjected to these factory raids solely because they happen to work alongside some undocumented aliens.[9] The average American, as we have long recognized, see *Carroll* v. *United States*, 267 U. S. 132, 154 (1925), expects some interference with his or her liberty when seeking to cross the Nation's borders, but until today's decision no one would ever have expected the same treatment while lawfully at work in the country's interior. Because the conditions which spawned such expedient solutions are in no sense the fault of these

---

Law of the House Committee on the Judiciary, 95th Cong., 2d Sess. (1978); and also by a Select Commission on Immigration and Refugee Policy, see United States Immigration Policy and the National Interest, Final Report of the Select Commission on Immigration and Refugee Policy 46, 61–62, 72–73 (1981).

[9] In this regard, the views expressed in JUSTICE WHITE's concurring opinion in *United States* v. *Ortiz*, 422 U. S. 891, 915 (1975), are particularly pertinent:

"The entire [immigration enforcement] system, however, has been notably unsuccessful in deterring or stemming this heavy flow [of illegal immigration]; and its costs, including added burdens on the courts, have been substantial. Perhaps the Judiciary should not strain to accommodate the requirements of the Fourth Amendment to the needs of a system which at best can demonstrate only minimal effectiveness as long as it is lawful for business firms and others to employ aliens who are illegally in the country. This problem, which ordinary law enforcement has not been able to solve, essentially poses questions of national policy and is chiefly the business of Congress and the Executive Branch rather than the courts."

lawful workers, the Court, as the guardian of their constitutional rights, should attend to this problem with greater sensitivity before simply pronouncing the Fourth Amendment a dead letter in the context of immigration enforcement. The answer to these problems, I suggest, does not lie in abandoning our commitment to protecting the cherished rights secured by the Fourth Amendment, but rather may be found by reexamining our immigration policy.

I dissent.