912 So.2d 672 (2005)
Kervince OSLIN, Appellant,
v.
STATE of Florida, Appellee.
No. 5D04-2951.
District Court of Appeal of Florida, Fifth District.
October 14, 2005.
James S. Purdy, Public Defender, and Marvin F. Clegg, Assistant Public Defender, Daytona Beach, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Lamya A. Henry, Assistant Attorney General, Daytona Beach, for Appellee.
*673 GRIFFIN, J.
Kervince Oslin ["Oslin"] appeals his convictions, entered pursuant to a plea of no contest, for possession of cocaine and resisting an officer without violence. His sole claim of error relates to the denial of his motion to suppress.
Oslin was charged on April 8, 2004, with possession of cocaine and resisting an officer without violence. Oslin pled not guilty and filed a motion to suppress claiming that the evidence against him had been illegally obtained. Specifically, Oslin asserted that he had been detained and searched without probable cause or reasonable suspicion of any wrongdoing.
At the suppression hearing, Officer Shurdom, of the Casselberry Police Department, testified that just before midnight on March 6, 2004, a resident telephoned the police and reported that two individuals, a black male and a white male, in their twenties, wearing red ball caps, were walking around in a residential neighborhood, acting "suspiciously." "Suspiciously" was not defined; there was no indication that they were looking through windows of homes or checking for unlocked doors. The name of the complainant and his address and phone number were obtained by the 911 dispatcher. The neighborhood is not a high crime area.
Officer Shurdom responded to the area and observed two men matching the description walking down the street with their backs to the officer. The officer illuminated his spotlight on the individuals. They turned their heads to look at the officer, turned back to look forward, and continued walking away. Officer Shurdom did not observe any unlawful activity.
Officer Shurdom tapped his air horn twice and jumped out of his marked police vehicle. The two individuals stopped. Officer Shurdom approached and, as he did, he asked, "Hey guys, what's up?" The two individuals turned toward the officer and the white male acknowledged the officer. According to the officer, he and the white male had known each other for some time. The other individual, Oslin, "just stood there."
The officer spoke with the white male, who explained they weren't doing anything wrong, they were just going to a friend's house. Officer Shurdom asked Oslin for identification, but he said he had none on him. The officer asked Oslin to write his name and date of birth on a notepad which the officer provided. Oslin wrote his name and what appeared to be a partial date of birth. The officer could not make out the date of birth and asked for some clarification, but "could tell by the attitude at that point that he just didn't care to give me his date of birth."
Officer Shurdom ran the information through the computer but no record came back. The officer then asked Oslin for his social security number but Oslin did not know it.
Meanwhile, a second officer arrived at the scene. Officer Shurdom continued to question Oslin about an address and began to conclude that "things weren't adding up." The officer believed Oslin was getting ready to flee and the officer announced that he had a police dog in the back of his vehicle "just in case he had any thoughts about running."
Officer Shurdom then requested consent to search Oslin for the purpose of finding evidence of identification. Oslin gave consent. The officer felt the exterior of Oslin's pockets and "one seemed to be dense, hard like an ID card." The officer reached into the pocket and "when I did retrieve all of the papers, I noticed there was crack cocaine in there with it in a baggie." Oslin was then handcuffed and arrested.
*674 According to the officer, what began as a consensual encounter turned into a detention when Oslin failed to provide accurate information about his identity and address. Officer Shurdom testified that had Oslin attempted to leave, he would have released his dog, which had been barking throughout the incident. The trial court denied the motion to suppress.
Apparently recognizing that Officer Shurdom had no basis for a Terry stop, the State contends on appeal that the initial contact between Officer Shurdom and Oslin was a consensual encounter. Oslin contends that when Officer Shurdom blew his "air horn" twice and jumped out of his car, after he and his companion continued walking down the street after having been "spotlighted" by the officer, a stop occurred. Oslin principally relies on Siplin v. State, 795 So.2d 1010 (Fla. 2d DCA 2001).
The facts in Siplin were that the officer had observed the defendant run up to a car while carrying a blue napkin in his hand. When the defendant saw the officer, he looked surprised. The defendant then leaned into the car, began conversing with the driver, and then walked away. The officer sounded the air horn on the patrol car to get the defendant's attention and, after the defendant stopped, began questioning him. The officer pointed to the blue napkin possessed by Siplin and asked what it was. Siplin gave it to the officer and the officer saw it contained cocaine and heroin.
The Second District reversed Siplin's drug conviction, holding that the use of the air horn created a stop of the defendant and that the officer lacked a reasonable suspicion to effect such a stop. The court analogized use of the air horn to use by an officer of his emergency lights, which it had held in Hrezo v. State, 780 So.2d 194 (Fla. 2d DCA 2001), elevated an encounter to an investigatory stop. The court explained:
In the Hrezo opinion, Judge Altenbernd specifically differentiates between an officer's takedown lights and spotlight. When an officer uses takedown lights a reasonable person would not feel free to leave. This is emphasized by the fact that only police officers or department of correction officers may use blue flashing lights on their vehicles pursuant to section 316.2397(2), Florida Statutes (2000). Furthermore, section 316.271(6) provides the siren, whistle, or bell on an emergency vehicle should only be used when the vehicle is responding to an emergency call or in pursuit of an actual or suspected violator of the law. On the other hand, use of a spotlight has been found not to transform a consensual encounter into an investigatory stop. See State v. Wimbush, 668 So.2d 280 (Fla. 2d DCA 1996). Officer Brook's air horn more closely resembles takedown lights, and therefore, he transformed the encounter into an investigatory stop. Appellant was required to stop when the officer activated his air horn, and he was not free to leave.
795 So.2d at 1011.
The State urges that Siplin should be limited to its facts, pointing out that in determining whether a police-citizen encounter is consensual the inquiry is whether the police conduct would have communicated to a reasonable person that he was free to leave or terminate the encounter. Taylor v. State, 855 So.2d 1 (Fla.2003). Applying this test to the undisputed facts in this case, Oslin was plainly stopped.
A citizen encounter becomes an investigatory stop once an officer shows authority in a manner that restrains the defendant's freedom of movement such that a reasonable person would feel compelled *675 to comply. Errickson v. State, 855 So.2d 700, 702 (Fla. 4th DCA 2003). The officer had already used his spotlight on the two men, who turned toward the light, observed the officer, turned away and resumed walking. This was a clear expression of a desire not to engage in a consensual encounter. The officer's use of the air horn, combined with the officer jumping out of his patrol car and hailing the two men, was designed to make the two men stop just as plainly as if the officer had yelled out, "Halt!" Siplin controls this case. A stop without a reasonable suspicion of criminal activity occurred and Oslin's consent to the search of his person was invalid as a product of an illegal stop. See Ford v. State, 783 So.2d 284 (Fla. 2d DCA 2001).
Even if use of the air horn did not itself elevate the encounter into an investigatory stop, other actions of Officer Shurdom did, well before the officer developed a reasonable suspicion of criminal activity. Oslin, when asked for identification, stated he had none. Rather than end the encounter, the officer persisted even though it was clear Oslin was unwilling to provide such information. An officer as part of a consensual encounter may ask an individual for identification. INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); Chappell v. State, 838 So.2d 645 (Fla. 5th DCA 2003), but the individual is not required to cooperate with the officer at this stage. Popple v. State, 626 So.2d 185, 186 (Fla.1993); Morrow v. State, 848 So.2d 1290 (Fla. 2d DCA 2003).[1] Finally, Oslin was certainly detained once Officer Shurdom announced that if Oslin had any thought of leaving the scene, he needed to know that the officer had a police dog in the back of his patrol car.
REVERSED.
ORFINGER, J., concurs.
PLEUS, C.J., dissents, with opinion.
PLEUS, C.J., dissenting.
I respectfully dissent because I agree with the trial court that Officer Shurdom had a reasonable suspicion to detain Oslin based upon the report of two suspicious persons, one black male and one white male, walking around houses in a residential neighborhood at midnight, Oslin's giving of a false name (Lorvin Lewis) and partial date of birth, and his failure to provide his social security number and address. Additionally, Officer Shurdom, a nine and one-half year veteran of the Casselberry Police Department, testified that Oslin appeared as if he were about to flee the scene.
The police officer's initial contact with Oslin was a consensual encounter. When Officer Shurdom approached Oslin and the white male, he did not have his gun drawn or have on his vehicle's emergency lights. The trial court found that during the course of this encounter, the officer developed reasonable suspicion to detain Oslin. At that point, the consensual encounter became an investigative stop and Officer Shurdom was able to detain Oslin. Oslin's subsequent consent to search was valid.
A proper review requires that this Court first determine whether the trial court's findings are supported by competent, substantial evidence. The appellate court must construe all the evidence and reasonable inferences therefrom in a manner *676 most favorable to upholding the trial court's decision. We should not reweigh the evidence and substitute our view of the evidence for that of the trial court which heard the testimony and observed the witnesses. In my opinion, the majority in this case has reweighed the evidence and substituted its view for that of the trial court.
The majority opinion focuses on the use of the air horn and relies on Siplin v. State, 795 So.2d 1010 (Fla. 2d DCA 2001) and Hrezo v. State, 780 So.2d 194 (Fla. 2d DCA 2001) for the proposition that use of an air horn "automatically" elevates a consensual encounter to an investigatory stop. Such a litmus test is unwarranted. Maybe it does, and maybe it does not. The relevant inquiry in determining if a particular police-citizen encounter is consensual is whether the police conduct would have communicated to a reasonable person that he or she was free to leave or terminate the encounter. Taylor v. State, 855 So.2d 1, 15 (Fla.2003). In making this assessment, the court must look to the totality of the circumstances surrounding the encounter. Id. There is no litmus test for distinguishing a police encounter from an investigatory stop. Williams v. State, 694 So.2d 878, 879 (Fla. 2d DCA 1997). Whether a police-citizen encounter is consensual is a factual question and the trial court's finding should not be disturbed on appeal unless clearly erroneous. Davis v. State, 594 So.2d 264, 266 (Fla.1992). The air horn was used simply to get Oslin's attention and not to conduct an investigatory stop. Officer Shurdom initially shined lights on the two men and they kept walking. Sounding the air horn was nothing more than an attempt to get their attention when the lights failed.
Further, the facts in Siplin and Hrezo are easily distinguishable. Unlike Siplin, the initial encounter here was consensual. Officer Shurdom did not order Oslin to stop, nor did he attempt to block his path. He did not approach in a threatening manner or use language that would indicate that compliance was compelled. The police officer's behavior was not forceful, intimidating or oppressive.
Subsequently, during the course of Officer Shurdom's interaction with Oslin, he developed a reasonable suspicion to detain him. "To determine whether information is sufficient to support a reasonable suspicion, the court must assess the totality of the circumstances known to the law enforcement officer and determine whether an experienced law enforcement officer could draw inferences and make deductions that would raise a suspicion that the individual being stopped was engaged in wrongdoing." Chappell, 838 So.2d 645, 647 (Fla. 5th DCA 2003). "A court's evaluation of reasonable suspicion must be guided by common sense and ordinary human experience." Id. Officer Shurdom's instincts and reasonable suspicion were confirmed when he found the cocaine.
In my opinion, the able trial judge applied common sense and ordinary human experience. He also applied appropriate law. I would affirm.
NOTES
[1] The giving of a false name to an officer is only a crime if it is done during an arrest or lawful detention. Cooks v. State, 901 So.2d 963 (Fla. 2d DCA 2005); Belsky v. State, 831 So.2d 803, 805 (Fla. 4th DCA 2002); Fournier v. State, 731 So.2d 75 (Fla. 2d DCA 1999); § 901.36, Fla. Stat. The giving of such misinformation during a consensual encounter does not, without more, afford a valid basis for an investigatory detention. Morrow.