943 F.2d 53
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NITED STATES of America, Plaintiff-Appellee,
v.
Terrance ANDERSON and Cory Landrum,[1]
Defendants-Appellants.
 Nos. 90-1242, 90-1253.
 United States Court of Appeals, Sixth Circuit.
 Sept. 4, 1991.
 
 Before MERRITT, Chief Judge, NATHANIEL R. JONES, Circuit Judge, and WELLFORD*, Senior Circuit Judge.
 
 AMENDED SUPPLEMENTAL PER CURIAM
 I. BACKGROUND
 
 1
 On April 12, 1989, drug enforcement agents Riddle, Denton and Gentry, while at the Detroit airport watching passengers disembarking from a Los Angeles flight, observed defendants, Terrance Anderson and Cory Landrum, leave the plane among the last passengers. Anderson and Landrum communicated briefly then parted ways, Anderson going to the bathroom, while Landrum made a phone call.
 
 
 2
 Riddle followed Landrum and tried to eavesdrop on his phone call. Landrum, however, lowered his voice and turned away. Landrum then walked to the baggage claim area, an out-of-the-way location for passengers not claiming baggage. Landrum proceeded to make another telephone call from this area. Landrum then sat in a chair not far from where Anderson was waiting by the baggage claim conveyor belt. While the two looked in the direction of one another several times, they engaged in no conversation and did not acknowledge one another's presence.
 
 
 3
 Anderson eventually picked up two bags after most of the rest of the waiting passengers had left the baggage area. After Anderson picked up his bags to leave, Landrum also left the area, without claiming any luggage, and by a separate exit. Riddle and Denton followed Anderson to a taxi stand.
 
 
 4
 At the taxi stand Riddle and Denton identified themselves as DEA agents and displayed their credentials. Denton asked Anderson for his airline ticket. Anderson showed him a ticket, paid for in cash, in the name of Michael Henderson. When asked for picture identification, Anderson claimed to have lost it. Denton thereupon asked Anderson to give consent to search of his bags. Anderson responded that he did not know of anything in the bags other than clothing, but made no objection. Denton patted Anderson down and shortly thereafter, an agent with a dog, trained to locate suspected drugs by smell, appeared in view. The agent handling the dog called to Riddle to tell him that the dog had "hit" on the bags in question. Riddle then told Anderson that he and the bags were being detained for further investigation, and took Anderson and his bags back into the airport.
 
 
 5
 Inside, Riddle asked Anderson again for consent to search the luggage. Anderson's response was ambiguous; Riddle pressed for a definite answer. Riddle testified that after initial inconclusive responses, Anderson finally gave permission for the search, which produced ten kilograms of suspected cocaine, money, and clothing. Anderson testified at the evidentiary hearing, however, that he had never given consent to the search, and that prior to the arrival of the dog, he had asked if he might leave, but was not given permission because the agents wanted to search his bags.
 
 
 6
 Meanwhile, Gentry stopped Landrum inside the airport between the double set of doors leading to the outside. Gentry asked him for his airline ticket which was provided (a one-way ticket from Los Angeles paid for in cash in Landrum's name). Gentry then inquired how long Landrum had been in Los Angeles; the response was that he had been there several days visiting friends. Gentry then asked Landrum why he had no luggage and Landrum responded that he kept his belongings in Los Angeles. After Gentry pursued the interview to request picture identification, Landrum produced a Michigan driver's license in his name. Gentry gave the license to another officer to check for warrants, if any, outstanding on Landrum. Gentry then searched Landrum's person while awaiting this additional information. It was at this juncture that Riddle and Denton discovered the cocaine in Anderson's bags. Both Anderson and Landrum were then placed under arrest.
 
 
 7
 At the time of his arrest, Anderson had a boarding pass he claimed to have found on the airplane in the name of Kevin M. Anderson. Airline records disclosed that, on the day before, a Kevin Anderson made a reservation on a flight from Detroit to Los Angeles and that this reservation was made about the same time as one was made by a person claiming to be C. Laldrun. The telephone number given by Laldrun was only one digit different from defendant Landrum's telephone number.
 
 
 8
 Anderson also had a set of car keys for a rental car found parked at Landrum's residence in Detroit. Fingerprints identified as those of Anderson and Landrum were found on the cocaine. In response to questions by agent Riddle, Anderson claimed that he was to receive a phone call giving him directions about where to take the bags.
 
 
 9
 Upon being indicted for drug offenses, Anderson moved to suppress the evidence discovered by the government agents in the luggage at the airport. The district court, at a suppression hearing, ruled that both the stop and later arrest of Landrum were proper and that there was no constitutional violation in that respect. In Anderson's case, the district court concluded first that the stop of Anderson was proper, and also that Anderson consented to the search of his luggage. It followed that his arrest was also valid. At the trial, Anderson was convicted of transporting 23 kilograms of cocaine. Landrum was acquitted on this substantive offense, but the jury could not reach a verdict on the conspiracy count for either defendant.
 
 
 10
 In Anderson's case, the prosecutor noted in closing argument that Anderson, when questioned after his arrest, did not give the kind of response one would expect if he were merely an unsuspecting carrier or innocent dupe. These closing remarks were in response to the defendant's theory that he was not connected with a drug organization and did not know that he was carrying drugs. The prosecutor stated that Anderson "was covering up." He added that he did "not recall any testimony from Gentry or anybody else that couriers or mules are not part of the [drug] organization."
 
 
 11
 Following the trial, resulting in no verdict on the conspiracy charge, Landrum filed a motion to dismiss, arguing that Riddle and Gentry had presented deliberately false testimony during the suppression hearing, having stopped Landrum, not on the basis of a claimed drug courier profile, but rather on the basis of a tip, apparently to the effect that two black males would be arriving on this flight from Los Angeles, one tall, one short, and that the shorter one would be named Cory. Agent Riddle had stated at the evidentiary hearing that he was not working on the basis of a tip. It was later determined that Agent Riddle knew about a vague tip giving no flight number or time and, although other of the agents may have known more particulars, he did not. The district court rejected Landrum's motion to dismiss finding that Riddle had not testified falsely and that, in any event, a withholding of evidence about a tip was not prejudicial to the defendants.
 
 
 12
 During jury deliberation in the ensuing second trial, the prosecution discovered that one of the selected jurors had been convicted of two felonies in the 1970s without indicating this history during voir dire. As counsel and the district judge were deliberating on a proper course of action, another juror wrote a note to the court complaining of threats by Brye, the juror who had been convicted. The district court then dismissed Brye under 28 U.S.C. § 1865(5). Landrum's counsel initially agreed to this dismissal of juror Brye, but later stated that he did not make any intelligent decision about whether to accept a verdict of the eleven remaining jurors, or whether instead to request a mistrial. Landrum's counsel was concerned that since the dismissed juror was black, as was the defendant, and the juror who felt threatened was white, that the other two black jurors might be influenced by the dismissal. The district court instructed the jury that if any juror felt they could not continue their deliberations impartially that they should write a note to the court in respect to what had transpired. Otherwise, the court would assume impartial deliberations were continuing. No response was made, and the eleven jurors reached a verdict of conviction of Landrum on the conspiracy charge. Each defendant appealed his conviction.
 
 II. SEARCH AND SEIZURE
 
 13
 The Fourth Amendment, relied upon by defendants, created "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." Defendant Anderson asserts that this right was violated by the actions of the DEA agents under the circumstances. He argues that he was stopped on the basis of insufficient evidence or suspicion, illegally arrested, and that his bags were searched without his consent. There is no detention in cases of this kind under the meaning of the Fourth Amendment "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." INS v. Delgado, 466 U.S. 210, 216 (1984). In determining whether the circumstances indicate a Fourth Amendment seizure the court "must take into account 'all of the circumstances surrounding the incident' in each individual case." Michigan v. Chesternut, 486 U.S. 567, 572 (1988) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (Stewart, J.)). Mere questioning by police officers does not necessarily result in detention for purposes of the Fourth Amendment.
 
 
 14
 [P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.
 
 
 15
 Delgado, 466 U.S. at 216 (citation omitted).
 
 
 16
 We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."
 
 
 17
 Mendenhall, 446 U.S. at 553-54 (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)).
 
 
 18
 In Mendenhall, two DEA agents observed Mendenhall arriving in Detroit on a commercial flight from Los Angeles early in the morning. On the basis of the facts that Los Angeles is a source city for Detroit, and that Mendenhall deplaned last, appeared nervous, scanned the area, did not claim luggage, and changed airlines for her flight out of Detroit, 466 U.S. at 547 & n. 1, the agents approached Mendenhall, identified themselves and asked to see her identification and airline ticket. The ticket indicated that Mendenhall was travelling under an assumed name and the agents asked Mendenhall to return to the airport for further questioning. The agents then obtained permission to search Mendenhall and heroin was discovered. Id. at 547-49. In analyzing the facts of the case Justice Stewart concluded that
 
 
 19
 no "seizure" of the respondent occurred. The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions.... In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure.
 
 
 20
 Id. at 555. This case is similar to Mendenhall. Justice Stewart's opinion did not, however, attract a majority of the court and three concurring Justices found the question of whether Mendenhall reasonably could have thought she was free to leave when asked for her driver's license and ticket to be an extremely close one. Id. at 560 n. 1.
 
 
 21
 In Reid v. Georgia, 448 U.S. 438 (1980), the DEA agent observed two people travelling from a source city, on a flight that arrived in the early morning hours. They appeared to be trying to conceal the fact that they were traveling together, and had only carry-on luggage. The DEA agent approached the men and asked them for their airline tickets and identification. The tickets showed that they had been in the source city for only one day and the agent testified that they appeared nervous during his questioning. The agent then asked them to return to the terminal and consent to a search of their persons and shoulder bags. The men turned back toward the terminal but one of the men dropped his shoulder bag and ran. A search of the shoulder bag uncovered cocaine. A divided Supreme Court held no "reasonable and articulable suspicion" existed in that case to validate the seizure.
 
 
 22
 In United States v. Sokolow, 490 U.S. 1 (1989), the most recent Supreme Court ruling on the issue of airport detentions, DEA agents, knowing that Sokolow had just returned from a three day trip to a well-known source city, that he had paid for his tickets with cash, that neither he nor his traveling companion had checked luggage, that he appeared nervous and scanned the area, and that his ticket appeared to be issued in an assumed name, approached Sokolow, identified themselves and moved him onto the sidewalk. They then asked for his airline ticket and identification. He responded that he had neither and that he was traveling under his mother's maiden name. Sokolow and his companion were then escorted to the DEA office in the airport where a narcotics detector dog alerted to their luggage. Cocaine was eventually found in one of Sokolow's bags. In this case the court again treated the initial contact with Sokolow as a stop but without explicitly deciding that it was in fact a Fourth Amendment seizure. Id. at 7. Finding that reasonable suspicion is necessary for such a stop and that such suspicion is not reducible to a neat set of legal rules the court analyzed the facts to conclude that a reasonable basis existed to suspect that Sokolow was transporting illegal drugs. Id. at 7.
 
 
 23
 We conclude that in the case at bar, Agent Riddle's hailing and questioning of Anderson is not a Fourth Amendment seizure. The actions of Riddle in questioning Anderson do not appear to have been so coercive that a reasonable person would conclude that he or she was not free to leave.
 
 
 24
 We are of the view that under these circumstances Riddle had the requisite minimal level of objective justification for a valid Fourth Amendment stop. Delgado, 466 U.S. at 217. "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." Sokolow, 490 U.S. at 7.
 
 
 25
 "In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances--the whole picture.' " Id. at 8. The facts offered by the DEA agents in this case as support for the requisite reasonable suspicion are as follows: (1) the flight originated in Los Angeles, a source city; (2) Anderson and Landrum were among the last to deplane creating the possibility that DEA agents may have left to follow other passengers; (3) Anderson and Landrum communicated then immediately split and failed explicitly to acknowledge one another's presence despite the opportunity to do so; (4) Landrum deliberately concealed his telephone conversation from Riddle's attempt to eavesdrop; (5) Landrum went to the baggage claim area which was out of the way since he had no baggage; (6) Anderson was nearly the last to retrieve his luggage; (7) both Anderson and Landrum left at the same time but by different exits. While each such action may be innocent on its face, we cannot ignore that a series of separately innocent acts taken together may warrant further reasonable investigation. In this case the facts were sufficient to warrant a stop and request of Anderson's ticket and identification. Sokolow, supra.
 
 
 26
 The questions posed by Riddle revealed that Anderson had purchased his ticket with cash, had no picture identification and was noticeably uncomfortable in the presence of the DEA agents. Anderson claims that at this point he asked if he was free to leave, was told that he was not, and that the stop had therefore ripened into detention which required probable cause. The trial court rejected this testimony,[2] and found that detention did not occur until Anderson's bags were identified by the narcotics dog at which point detention was justified. See Florida v. Royer, 460 U.S. 491, 506 (1983) (dicta stating that if a dog had been used to search Royer's bags and a positive result had been obtained police could justifiably have arrested him upon probable cause).
 
 
 27
 The prosecutor presented evidence that Anderson had consented to the search, and the district court believed this version of the encounter. To justify a search on the basis of consent, the government must
 
 
 28
 demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.
 
 
 29
 Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973) (footnote omitted). We hold in this case that it was not error to conclude that Anderson's consent occurred during a valid detention, and that his consent was valid.[3]
 
 III. OTHER CONTENTION
 
 30
 Anderson argues that failure by the government agents to disclose at the evidentiary hearing that there had been a tip in the case also required that the evidence of cocaine be suppressed. Defense counsel learned of the tip for the first time at trial when Gentry acknowledged that there had been a tip. Anderson contends that since Riddle knew of the tip that he deceived the court when he testified that the basis of their suspicion of Anderson and Landrum was solely the two men's actions in light of the drug courier profile, and the evidence should therefore be suppressed. Alternatively, Anderson and Landrum suggest that an unsubstantiated tip was the true basis of the police suspicion. A review of the record reveals, however, that Riddle's testimony is compatible with the government's contention that the basis of their suspicion actually was the conduct of Landrum and Anderson, not a tip. The tip was very vague and did not include information about a particular flight. Even if an agent who knew of the tip initiated surveillance of the particular flight involved, we find this no basis to suppress the evidence. Error, if any, in this regard was harmless. Franks v. Delaware, 438 U.S. 154 (1978).
 
 
 31
 Title 28 U.S.C. § 1865(b)(5) provides that a person is unqualified to sit on a petit jury in federal district court if the person "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." During Landrum's trial it was discovered that juror Brye had such a conviction, and we conclude that there was no error in his dismissal.
 
 
 32
 Federal Rule of Criminal Procedure 23(b) provides;
 
 
 33
 Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.
 
 
 34
 The advisory committee which approved the amendment to Rule 23(b) expressed its belief that the added clause would aid the efficient administration of justice. The committee noted that "[t]he problem is acute when the trial has been a lengthy one and consequently the remedy of mistrial would necessitate a second expenditure of substantial prosecution, defense and court resources."
 
 
 35
 The district court judge called the entire jury back and informed them that they should notify him by private note if they had any difficulty in pursuing their responsibilities. None indicated any problem in this regard.
 
 
 36
 Implementation of Rule 23(b) is left to the discretion of the trial court. United States v. Ramos, 861 F.2d 461, 465-66 (6th Cir.1988) (citing cases), cert. denied sub nom. Longmire v. United States, 489 U.S. 1071 (1989); Sutton v. United States, 490 U.S. 1011 (1989). While it may be appropriate in certain circumstances to conduct individual voir dire, we cannot say that the trial court in this case abused its discretion or authority in the actions taken. Use of Rule 23(b) has not been restricted to lengthy trials only. United States v. O'Brien, 898 F.2d 983, 986 (5th Cir.1990).
 
 
 37
 Anderson argues that his Fifth Amendment right not to incriminate himself was violated by the prosecutor in closing arguments. As noted, the prosecutor referred to Anderson's responses to the DEA agent's questions at the airport. In United States v. Driscoll, 454 F.2d 792, 800 (5th Cir.1972), the court noted that "oblique comments on a defendant's failure to testify, if sufficiently suggestive, are as unlawful as direct comments." While the comments may have been questionable, they are not, in our view, sufficiently suggestive or violative of Anderson's rights to mandate a reversal.
 
 
 38
 We accordingly AFFIRM the conviction of Terrance Anderson.
 
 
 
 [1]
 Subsequent to this appeal and oral argument, we have been advised that Cory Landrum has died. His appeal is therefore rendered moot
 
 
 *
 JUDGE WELLFORD TOOK SENIOR STATUS EFFECTIVE JANUARY 21, 1991
 
 
 [2]
 See Sawyer v. Arun, 690 F.2d 590, 592 (6th Cir.1982), as to the effect of a district court's credibility finding
 
 
 [3]
 There appears to have been sufficient probable cause for an arrest after the search dog alerted to Anderson's baggage