JOURNAL ENTRY AND OPINION
{¶ 1} Appellant, Glenn Portis, appeals the trial court's denial of his motion to suppress. After a thorough review of the record and for the reasons set forth below, we affirm.
 {¶ 2} On July 31, 2007, a grand jury indicted appellant on two counts. Count One charged drug possession under R.C. 2925.11(A), and Count Two charged possession of criminal tools under R.C. 2923.24(A). On September 26, 2007, appellant filed a motion to suppress. On November 8, 2007, the trial court held a hearing on the motion to suppress, which it denied. On that same date, appellant pled no contest. On December 11, 2007, the trial court sentenced appellant to one year of community control sanctions.
 {¶ 3} The facts that gave rise to this appeal began on July 12, 2007. On that date, Cleveland Police Officer Frank Cruz testified that he received a radio dispatch about "shots fired" in the area of South Boulevard and Westchester Avenue. Officer Cruz responded to the scene, where he found a group of five people standing in the driveway of a house on Westchester Avenue.
 {¶ 4} After some discussion, the people told the officer that a shooting had occurred. According to Officer Cruz, he spoke primarily with one "main person." This person told the officer his whole name, and the officer recorded his last name, "Roberts."
 {¶ 5} According to Officer Cruz, Roberts told him that a man named Glen Portis argued with some men in the driveway and shot at them. Roberts *Page 4 
described appellant's vehicle and gave a description of appellant's house on East 91st Street. Roberts told the officer that appellant had driven away in his tan car after the shooting. Finally, Officer Cruz testified that Roberts told him that appellant was his mother's "boyfriend or something like that." According to Officer Cruz, the other people in the driveway corroborated Roberts' story.
 {¶ 6} Officer Cruz testified that other officers had arrived on the scene, and that some of them had broadcast the information over the police radio. Officer Cruz left the scene and found appellant's vehicle parked on East 91st Street. The officer testified that eventually Sergeant Michael Butler and Officer Maurice Sanders arrested appellant nearby.
 {¶ 7} Sargeant Butler testified that on July 12, 2007, he was patrolling with Officer Sanders when they heard a dispatch about "shots fired." Subsequent dispatches informed them that the suspect was named Glen Portis, he was driving a tan Chevy or Buick, and he lived at an address on East 91st Street.[1]
 {¶ 8} Sergeant Butler testified that he drove to appellant's address and noticed a tan car parked on the street. He and Officer Sanders also saw a man matching appellant's description walking by a nearby abandoned building. *Page 5 
Appellant was suspiciously looking over his shoulder as he walked in a "hurriedly fashion"; therefore, the police followed him to a parking lot.
 {¶ 9} Sergeant Butler approached appellant and inquired if his name was Glen, to which appellant responded "yes." The policemen exited their vehicles, and Officer Sanders patted down appellant. Sergeant Butler testified that he and Officer Sanders "went ahead and conducted aTerry frisk on the male to make sure we didn't have any undue weapons besides the two that we were carrying." The pat down revealed a cell phone with a plastic bag of cocaine attached in appellant's pants pocket.
 {¶ 10} Officer Sander's testimony was almost identical to Sergeant Butler's. According to Officer Sanders, while patting down appellant, he felt a hard object in his pocket. The object was shaped like "a magazine or the handle to a service weapon." When he pulled the object out of the pocket, it was a cell phone with a plastic bag that was knotted with a long open end. According to the officer, when he feels an object that he believes might be a weapon, he immediately pulls it out. Officer Sanders specifically testified that he did not handcuff appellant until after the pat down revealed that he had cocaine on his person. He also specifically stated that the objects were found in appellant's pockets, not clipped to his waistband as appellant alleges.
 {¶ 11} Samuel Roberts testified for the defense. He testified that he lives on Westchester Avenue with his mother, siblings, and appellant, who is his *Page 6 
stepfather. He was in his bedroom on July 12, 2007, when he heard two or three shots. He evacuated all of the household members to his sister's house. According to Roberts, he was standing in his driveway on his way to leave when the police arrived. He testified that six squad cars arrived, and the police had their guns drawn and patted down everyone. When asked who had a gun, Roberts told the police "no one." When asked who drove a gold car, Roberts said "Glen Portis." However, Roberts denied that he identified appellant as the gunman or that he gave a description of appellant's car.
 {¶ 12} Appellant testified on his own behalf. He said that he was standing in the driveway of his house when a man named Los began shooting at him. He jumped in his car and drove away. After realizing that his car's tire had been "shot out," he parked his car near his ex-wife's house on East 91st Street and went for a walk. He testified that during his walk, the police pulled up next to him and asked his name. He answered, "Glen Portis." Appellant testified that an officer got out of the car and immediately handcuffed him. Thereafter, the officers took his cell phone from his waistband and removed $19 and a bag of cocaine from his pocket. Appellant denied that the drugs were his. He also alleged that he told the police someone had been shooting at him.
 Review and Analysis {¶ 13} Appellant brings this appeal, asserting one assignment of error for our review. *Page 7 
 {¶ 14} "I. The trial court erred in denying defendant-appellant's motion to suppress the fruits of an unlawful search."
 {¶ 15} Appellant argues that the trial court erred when it denied his motion to suppress. More specifically, he alleges that the arresting police officers had no reasonable suspicion of criminal activity when he was detained. He also alleges that, even if the detention was legal, the police exceeded the scope of an appropriate pat down. This argument is without merit.
 Standard of Review {¶ 16} In State v. Lloyd (1998), 126 Ohio App.3d 95, 100,709 N.E.2d 913, the court stated that "our standard of review with respect to motions to suppress is whether the trial court's findings are supported by competent, credible evidence." This is the appropriate standard because "in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses."State v. Hopfer (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321. However, once we accept those facts as true, we must independently determine, as a matter of law and without deference to the trial court's conclusion, whether the trial court met the applicable legal standard.
 The Fourth Amendment {¶ 17} The Fourth Amendment to the United States Constitution states that "the right of the people to be secure in their persons, houses, papers, and *Page 8 
effects, against unreasonable searches and seizures, shall not be violated." Police must obtain a warrant based on probable cause before they conduct a search; however, the warrant requirement is subject to a number of well-established exceptions. Coolidge v. New Hampshire (1971),403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564. One such exception includes a search conducted pursuant to Terry v. Ohio (1968),392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.
 Terry Exception {¶ 18} Under Terry, a police officer may stop and investigate unusual behavior, even without probable cause to arrest, if he has sufficient evidence to reasonably conclude that criminal activity is afoot. Id. at 31. The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. An investigatory stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." UnitedStates v. Cortez (1981), 449 U.S. 411, 417, 101 S.Ct. 690,66 L.Ed.2d 621.
 {¶ 19} "The officer [making a Terry stop] * * * must be able to articulate something more than an `inchoate and unparticularized suspicion or "hunch."' Terry, supra at 27. The Fourth Amendment requires `some minimal level of objective justification' for making the stop.[Immigration Naturalization Service] v. Delgado (1984), 466 U.S. 210,217. That level of suspicion is *Page 9 
considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means `a fair probability that contraband or evidence of a crime will be found,' Illinois v.Gates [1983], 462 U.S. 213, at 238, and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause."Alabama v. White (1990), 496 U.S. 325, 330, 110 S.Ct. 2412,110 L.Ed.2d 301.
 {¶ 20} In the case at bar, the police based their conclusion that criminal activity was afoot upon statements made by an informant (Roberts). Courts have generally recognized three categories of informants: identified citizen informants, known informants, and anonymous informants. City of Maumee v. Weisner, 87 Ohio St.3d 295, 300,1999-Ohio-68, 720 N.E.2d 507.
 {¶ 21} The Ohio Supreme Court has suggested that an identified citizen informant may be highly reliable and that a strong showing regarding other indicia of reliability may be unnecessary. Id. InWeisner, the Court recognized that Ohio appellate courts have accorded the identified citizen informant higher credibility and found that a person who provided his name and telephone number to the police to be an identified citizen informant. See Weisner, supra.
 {¶ 22} We find that Roberts was an identified citizen informant because Officer Cruz testified that he spoke to Roberts face-to-face in the driveway of his home immediately following the alleged shooting, obtained Roberts' first and last name, and recorded his last name. *Page 10 
 {¶ 23} After determining that an informant is an identified citizen informant, we must also look at the totality of the circumstances in order to determine the reliability of a tip. State v. Gatewood(Dec. 22, 2000), 1st Dist. No. C-000157. Factors to consider include whether the information was gained from the informant's personal observation, whether the informant had continued contact with the police, and what motivation prompted the tip. Id.
 {¶ 24} Under the totality of the circumstances, we find that Roberts' information was reliable. Roberts told police, face-to-face, that appellant had been shooting, left in a tan car, and had lived at the address on 91st Street. Roberts answered all of the officer's questions right at the scene. Finally, Roberts was motivated to inform the officers after they asked who had been shooting. In fact, the fact that the suspect was Roberts' stepfather makes the information even more reliable. It is unlikely that Roberts would purposely misinform the police that a family member had committed a crime.
 {¶ 25} We note appellant alleges that Officer Cruz fabricated the information Roberts told him because, at the motion to suppress hearing, Roberts contradicted all of the officer's testimony. However, as discussed earlier, "our standard of review with respect to motions to suppress is whether the trial court's findings are supported by competent, credible evidence." Lloyd, supra at 100. The discrepancy in testimony is a credibility issue on which we accord the trial court deference because the trial court was the trier of fact and was in the *Page 11 
best position to resolve questions of fact and evaluate the credibility of witnesses. Hopfer, supra at 548. Accordingly, we find that Roberts was a citizen informant who provided reliable information that the police could reasonably rely on to conclude that appellant was engaged in criminal activity.
 Terry Stop {¶ 26} Based on the totality of the circumstances, we find that the police conducted an appropriate Terry stop. Officer Cruz learned from an identified citizen informant, and informed dispatch, that the suspect was appellant; that appellant drove a gold-colored car; and that appellant had lived on 91st Street. Subsequently, dispatch provided Sergeant Butler and Officer Sanders with appellant's name, description, former address, and car color. Using this information, Sergeant Butler and Officer Sanders located appellant near his parked car. Appellant walked quickly from the scene, suspiciously looking over his shoulder. Thereafter, the officers drove up to appellant, who identified himself as Glen.
 Pat Down Search {¶ 27} Appellant's next argument is that the officers acted inappropriately when they chose to pat down appellant after detaining him. During a Terry stop, an officer may perform a protective search for weapons if, based upon a totality of the circumstances, he has a reasonable suspicion that an individual is presently armed. State v.Bobo (1988), 37 Ohio St.3d 177, 181, 524 N.E.2d 489. *Page 12 
 {¶ 28} It is clear that the officers had a reasonable suspicion that appellant was armed and dangerous. The police were responding to a situation that began with a 911 call regarding shots fired. They discovered appellant after reasonably relying on the informant's information and information from dispatch. The officers had every reason to believe that appellant could have been presently armed and dangerous. During the patdown, Officer Sanders felt a hard object in appellant's pocket and, based on his experience, determined from the object's size and shape that it might be a gun. During a protective pat down, if an officer feels an object whose size and density indicated it might be a weapon, he may remove the object. State v. Evans, 67 Ohio St.3d 405,415, 1993-Ohio-186, 618 N.E.2d 162. While removing the alleged weapon, Officer Sanders discovered that it was a cell phone with a bag of cocaine attached to it.
 {¶ 29} We note appellant alleges that Officer Sanders handcuffed him before the pat down and thereafter exceeded the scope of an appropriate pat down. According to appellant, there was no need for the officer to enter his pocket because the cell phone was clipped to his waistband, not in his pocket.
 {¶ 30} Officer Sanders testified that he only handcuffed appellant after discovering the drugs. Further, the officer stated that the cell phone was not on appellant's waistband, but in his pocket with the bag of cocaine attached to it. Again, the discrepancy in testimony is a credibility issue on which we accord the trial court deference because the trial court was the trier of fact and was in the *Page 13 
best position to resolve questions of fact and evaluate the credibility of witnesses. Hopfer, supra at 548. The trial judge simply believed that Officer Sanders' testimony was more credible than appellant's.
 {¶ 31} In conclusion, based upon the totality of the circumstances, the police clearly had reasonable suspicion that appellant was engaged in criminal activity. As such, they appropriately apprehended him in the parking lot. Finally, the pat down search was appropriate because the officers had a reasonable suspicion that appellant was armed based on the totality of the circumstances. Accordingly, appellant's assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, P.J., and MELODY J. STEWART, J., CONCUR.
[1] Although appellant currently lives with his wife, Sheila Roberts, on Worchester Avenue, dispatch discovered the East 91st
Street address. Appellant testified that he used to live on East 91st Street with his former wife. *Page 1