

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00163-CR

**JAMALL RIDDAN KENNEDY,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 54th District Court
### McLennan County, Texas
### Trial Court No. 2012-722-C2

## MEMORANDUM  OPINION

A jury found Appellant Jamall Riddan Kennedy guilty of the offenses of possession of cocaine and possession of heroin and assessed his punishment at sixty years' imprisonment as a habitual felon for each offense.  This appeal ensued.

### Motion to Suppress

In his first issue, Kennedy contends that the trial court abused its discretion in denying his motion to suppress because the police detained or seized him without probable cause or reasonable suspicion and, as a direct result of the illegal detention, all

evidence against him was discovered and seized. The State responds that the trial court did not abuse its discretion in denying Kennedy's motion to suppress because the police encounter with Kennedy was consensual and because the officers nevertheless had reasonable suspicion to temporarily detain and investigate Kennedy after law enforcement had been observing him for three days.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor; and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's ruling on those questions *de novo*. *Id.* When, as here, the trial court does not make explicit findings of fact in ruling on a motion to suppress evidence, we "review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported by the record." *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (quoting *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)); *Carmouche*, 10 S.W.3d at 327-28.

As a preliminary matter, Kennedy also argues that, in reviewing the propriety of the trial court's ruling on the motion to suppress in this case, we should consider not

only the evidence presented at the suppression hearing but also evidence presented during the trial. The general rule is: In cases in which the trial court is never asked to exercise its discretionary authority to reopen the suppression hearing, appellate review of the trial court's ruling on the motion to suppress is ordinarily limited to that evidence presented at the pretrial hearing—the evidence that was before the court at the time of its decision. *Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012). But if the parties consensually broach the suppression issue again before the fact-finder at trial, the reviewing court should also consider the evidence adduced before the fact-finder at trial in gauging the propriety of the trial court's ruling on the motion to suppress. *Id.* Although Kennedy did not request the trial court to reconsider its ruling on his motion to suppress, the suppression issues were relitigated at trial.[1] *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). Accordingly, in reviewing the propriety of the trial court's ruling on the motion to suppress, we will consider not only the evidence presented at the suppression hearing, but also the evidence presented during the trial. *See Black*, 362 S.W.3d at 635; *Rachal*, 917 S.W.2d at 809.

> Law enforcement and citizens engage in three distinct types of interactions: (1) consensual encounters, (2) investigatory detentions, and (3) arrests.

---

[1] Kennedy's counsel even stated without objection in his opening statement:

> The question in this case, ladies and gentlemen, is very simple. Would a reasonable person placed in Mr. Kennedy's position feel free to leave. And if you can't leave, you can't reasonably feel free to leave. And if you can't reasonably feel free to leave, you're seized.
>
> What we're going to ask you to do, ladies and gentlemen, is examine these facts, apply the law as you swore the oath as you told yesterday you would do, find that the actions of the Waco police officers lead [sic] to a seizure [and] that the consent was then illegal and ask that you find Mr. Kennedy not guilty.

Consensual police-citizen encounters do not implicate Fourth Amendment protections. Law enforcement is free to stop and question a fellow citizen; no justification is required for an officer to request information from a citizen. And citizens may, at will, terminate consensual encounters. Even when the officer did not communicate to the citizen that the request for information may be ignored, the citizen's acquiescence to an official's request does not cause the encounter to lose its consensual nature. Courts consider the totality of the circumstances surrounding the interaction to determine whether a reasonable person in the defendant's shoes would have felt free to ignore the request or terminate the interaction. If it was an option to ignore the request or terminate the interaction, then a Fourth Amendment seizure has not occurred. The surrounding circumstances, including time and place, are taken into account, but the officer's conduct is the most important factor when deciding whether an interaction was consensual or a Fourth Amendment seizure.

No bright-line rule governs when a consensual encounter becomes a seizure. Generally, however, when an officer through force or a showing of authority restrains a citizen's liberty, the encounter is no longer consensual. This is the point at which an encounter becomes a detention or arrest, both of which are seizures under the Fourth Amendment. Thus, Fourth Amendment scrutiny becomes necessary. When there is a detention, courts must decide whether the detaining officer had reasonable suspicion that the citizen is, has been, or soon will be, engaged in criminal activity. When there is a warrantless arrest, courts must determine whether the arresting officer had probable cause to believe the same. The State bears the burden of producing specific articulable facts showing reasonable suspicion and probable cause. To meet its burden, the State may present the specific facts known to the officer at the moment the seizure occurred. In making this determination, courts use "commonsense judgments and inferences about human behavior."

When a defendant asserts a search and seizure violation under the Fourth Amendment, the defendant bears the burden of producing evidence to rebut the presumption of proper conduct by law enforcement. A defendant can satisfy this burden with evidence that the seizure occurred without a warrant. If the defendant satisfies the initial burden, the burden then shifts to the State to establish that the seizure was nevertheless reasonable under the applicable standard—either reasonable suspicion or probable cause.

*State v. Woodard*, 341 S.W.3d 404, 410-12 (Tex. Crim. App. 2011) (citations omitted).

In this case, the State stipulated at the suppression hearing that the search and arrest were made without a warrant. Waco Police Officer Brad Skaggs then testified that he was working in the Street Crimes Unit on January 5, 2012, and they were performing surveillance on 1140 Faulkner based on an anonymous tip that Officer Daniel Kent had received about two weeks before. Officer Kent had received the tip from someone who said that she lived in the house at 1140 Faulkner and that narcotics were being sold out of the vehicle parked in the driveway. The tip included the house address; the names of the individuals living in the house; the make, model, color, and license plate number of the vehicle; and the types of drugs being sold.

Officer Skaggs testified that he and another officer had watched the location the night of January 4. During their surveillance on the night of January 5, they were then able to verify that a vehicle in the driveway of 1140 Faulkner was the same type, make, and color—a green Ford Taurus—and had the same license plate as the vehicle described in the tip. Officer Skaggs saw a man later identified as Kennedy sitting in the vehicle, and he saw a lot of "foot traffic"—people walking up to the driver's side of the vehicle and then leaving. Officer Skaggs stated that he did not see anyone actually being handed drugs but that the "foot traffic" could be consistent with dealing narcotics from the vehicle. He said that Kennedy sat in the vehicle in the driveway for quite a while and never left. Based on the circumstances, the officers decided to have a consensual encounter with Kennedy.

Officer Skaggs testified that he approached the location from the east and parked to the east of the driveway while Officer Kent approached from the west and parked to the west of the driveway. They did not block the driveway, which was important because they wanted to have a consensual encounter with Kennedy. Likewise, they did not use their emergency lights or sirens when they approached. Officers Skaggs and Kent got out of their vehicles at about the same time and approached Kennedy's vehicle—Officer Skaggs went to the driver's side while Officer Kent went to the passenger's side. Officer Skaggs said that two other officers were on a street behind the residence at that time and began walking through the backyard to the front of the house. Another officer was also on foot, walking to the residence from a short distance away.

Officer Skaggs testified that it was about 10:40 p.m., so he was using his flashlight. He did not have his weapon drawn. He began talking with Kennedy through the open driver's-side window. No one else was in the vehicle. Officer Skaggs stated that he believed that he told Kennedy that he was not under arrest or anything and that he asked him if they had met before. He then asked for Kennedy's identification, which Kennedy provided, and he assured Kennedy that he had done nothing wrong. While Officer Skaggs ran a records check, he continued to talk to Kennedy. He stated that, at some point, he told Kennedy about the information that they had received and asked Kennedy if he had "ever been handled for anything illegal."

Officer Skaggs testified that Kennedy had a Styrofoam food container in his lap with what looked like a Frito pie in it. Kennedy was covering the open food container with his hand and a napkin. During the records check, Officer Skaggs noticed Kennedy's hand covering up what appeared to be crack cocaine in a plastic baggie. Officer Skaggs stated that he decided to have Kennedy get out of the vehicle at that point and signaled for Officer Kent to come around the vehicle to the driver's side to back him up. Officer Skaggs then asked Kennedy to get out of the vehicle and if Kennedy would consent to the search of his vehicle. Kennedy said yes, opened the door of the vehicle, and stepped out. When Kennedy got out of the vehicle, Officer Skaggs could see another plastic baggie with what looked like crack cocaine in it in the handle of the car door.

Officer Skaggs testified that Kennedy was detained at that point and placed in the back of his patrol car. They ultimately found marijuana, heroin, pills, and crack cocaine in the Styrofoam food container. Officer Skaggs said that he believed that the two officers that were behind the house walked up to the left of the driveway and ended up at the front door to the home. He assumed that they were using their flashlights. He believed that they arrived shortly after he had made contact with Kennedy.

Officer Kent testified that he was also in the Street Crimes Unit but that he was assigned to Teleserve due to an off-duty injury around the end of 2011 and beginning of 2012. During that time, he took a call from a woman who said that she was living at 1140 Faulkner and that a man nicknamed "Rudy" was selling drugs out of the house.

She identified the drugs Rudy was selling and described his vehicle as a green Ford Taurus. Officer Kent stated that the neighborhood containing Faulkner, J J Flewellen, and Dawson was an area of higher drug activity.

Officer Kent testified that he and his unit decided to follow up on the tip once he had been released to go back to full duty, which was about two weeks later. They surveilled 1140 Faulkner for three days. The first day, they did not see much happening at the location. The second day, they noticed a vehicle matching the description given in the tip parked in the driveway with a black male sitting in it. Officer Kent believed that the man had a computer inside the vehicle, which he said was odd but not indicative that the man was selling drugs. The third day, January 5, 2012, they saw the green Ford Taurus in the driveway of the residence; a man later identified as Kennedy sitting in the vehicle; and several people approaching the vehicle, speaking to Kennedy, and then leaving after a short period of time. Officer Kent stated that he did not see any hand-to-hand drug buys, but he described the various people approaching the car and leaving after a short time as suspicious activity that was consistent with drug activity.

Officer Kent testified that they watched the location for about an hour and then decided to have a consensual encounter with Kennedy. He and Officer Skaggs pulled up and parked on each side of the driveway. He was in a marked police car, and Officer Skaggs was in an unmarked car. Neither used his emergency lights or siren, and they did not block the driveway. Officer Kent stated that Officer Skaggs approached the driver's side of the vehicle while he went to the passenger's side. It was about 10:40 p.m., so he and Officer Skaggs used their flashlights.

Officer Kent testified that Officer Skaggs began talking to Kennedy, the only occupant of the vehicle. Officer Kent noticed that Kennedy had a Styrofoam food container in his lap with what appeared to be a Frito pie and a white napkin in it. Officer Skaggs asked for Kennedy's identification and then waited for his record to return. Officer Kent said that the records check is run off of their radios through dispatch and that it is usually "pretty quick" but could take several minutes. Kennedy continued to eat the food out of the Styrofoam container, but he seemed to always set the napkin in a certain place and kept it "pretty covered up." Kennedy never voiced any desire to leave or to discontinue the encounter.

Officer Kent testified that he believed that the two officers who approached from the back were at the front door at that point. He thought the porch light was on and could not remember if the officers had their flashlights out. He stated that the other officer on foot arrived about a minute or two after the two officers walking from the back of the residence and that he believed that he told the other officer to go to the back of the house, which he did.

Officer Kent stated that after "maybe a few minutes at the most," Officer Skaggs signaled for him to come around the vehicle to the driver's side to back him up. Officer Kent said that he went around to the driver's side of the vehicle. Officer Skaggs then had Kennedy get out of the vehicle, and Kennedy was placed in handcuffs. When Kennedy was placed in handcuffs, he placed the Styrofoam container on the ground.

Officer Kent testified that Officer Skaggs told him that he had seen what he thought was cocaine in the driver's side door handle of the vehicle. When he looked

there, he did see what appeared to be cocaine. He also looked in the Styrofoam container and found heroin, cocaine, marijuana, and Xanax pills.

Kennedy testified that he was in the car at 1140 Faulkner on the night of January 5, 2012, and had gotten a Frito pie from the store across the street about four or five minutes before encountering the officers. No one had walked up to his car that night before the officers. Kennedy said that he saw a gray unmarked police vehicle pull up in front of the neighboring house at the same time that a marked police vehicle pulled up in front of 1140 Faulkner. He said that he agreed with the officers' testimony as to where their vehicles were parked that night. A white Suburban was parked in front of his car.

Kennedy testified that Officer Skaggs got out of the unmarked vehicle and came around the back of his car to the driver's side while Officer Kent got out of the marked vehicle and came around the back of his car to the passenger's side. As Officers Skaggs and Kent approached, Kennedy could see the light from another officer reflecting off the side of the white Suburban and the house.

Kennedy stated that Officer Skaggs first asked him if he lived at the residence. Kennedy replied that he did not but that his girlfriend did. At that time, Kennedy's girlfriend looked out and then shut the door of the residence. Kennedy saw an officer standing behind Officer Skaggs on the sidewalk. Officer Skaggs pointed toward the front door of the residence, and the officer went to the front door, banged on it, and told "whoever was near the front door to open the door." Kennedy testified that Officer Skaggs then turned toward Kennedy and asked for his identification. Kennedy also

said that when Officer Skaggs first walked up, Kennedy asked him why he was there and that Officer Skaggs told him that he would tell him after Kennedy gave him his identification card. Kennedy gave Officer Skaggs his school identification, reasoning that Officer Skaggs would not tell him why he was there unless he gave Officer Skaggs his identification. Kennedy testified that Officer Skaggs took Kennedy's identification and began checking to see if he had any warrants, which he did not. When asked how long it was after Officer Skaggs had arrived that he took Kennedy's identification, Kennedy replied that it was "under a minute, minute and a half."

Kennedy said that while waiting on the records check, Officer Skaggs asked him about what he was eating. Officer Skaggs did not mention drugs or why he was there. All of the officers were in the front of the house—Officers Skaggs and Kent were on either side of his car, an officer was on the front porch banging on the door, and two officers were standing on the sidewalk. All the officers were using their flashlights. Kennedy said that the officers were "pretty much somewhat canvassing" and "[p]retty much all over the yard." He said specifically that one officer looked in the trash can with his flashlight and that Officer Kent flashed his light inside the Suburban. Officer Skaggs remained no more than six inches from Kennedy's door and was looking inside his vehicle. Kennedy confirmed, however, that the additional officers at the front door never approached him in any way while he was in his vehicle. After Officer Skaggs pulled him out of the vehicle, Kennedy put the container on the ground, and Officer Skaggs patted him down and put him in handcuffs.

Kennedy testified that no one ever told him that he was free to leave and that when Officer Skaggs took his identification card, he did not feel like he was free to leave or that anybody would have felt free to leave. Kennedy said that if he had tried to get out of the car, he would have hit Officer Skaggs and that if he had tried to back up the car, he would have likely hit the officers with his mirrors. On the other hand, Kennedy stated that he never asked to leave. When asked if the officers did "anything threatening or anything like that," Kennedy replied, "No." Kennedy agreed that Officer Skaggs never pointed a weapon at him. Kennedy, however, stated that they approached him "quick enough," started talking to him "instantly," took his identification, and banged on the door of the residence before pulling him out of the car. Kennedy said that he knows that Officer Skaggs had not seen the drugs in his lap when he asked him to get out of the car because the drugs were not on his lap. Furthermore, the drugs that Officer Skaggs had said were in the car door were in the door, but Officer Skaggs did not see them when he said he saw them.

We agree with the State that the initial encounter with Kennedy was a consensual encounter. Police officers are as free as any other citizen to knock on someone's door and ask to talk with him or her or to approach citizens on the street or in their cars and ask for information or their cooperation. *State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008).

> Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-window squeegee man. All of these social interactions may involve embarrassment and inconvenience, but they do not involve official coercion. It is only when the police officer "engages in conduct

which a reasonable man would view as threatening or offensive even if performed by another private citizen," does such an encounter become a seizure. It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure. At bottom, the issue is whether the surroundings and the words or actions of the officer and his associates communicate the message of "We Who Must Be Obeyed."

*Id.* (footnote omitted). In *Garcia-Cantu*, the court of criminal appeals quoted with approval Professor LaFave's statement regarding the line between encounter and detention with respect to citizens seated in parked cars:

The mere approach and questioning of such persons does not constitute a seizure. The result is not otherwise when the officer utilizes some generally accepted means of gaining the attention of the vehicle occupant or encouraging him to eliminate any barrier to conversation. The officer may tap on the window and perhaps even open the door if the occupant is asleep. A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so. Likewise, the encounter becomes a seizure if the officer orders the suspect to "freeze" or to get out of the car. So too, other police action which one would not expect if the encounter was between two private citizens—boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority—will likely convert the event into a Fourth Amendment seizure.

*Id.* (quoting 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.4(a), at 427 (4th ed. 2004)).

Here, there was nothing threatening or coercive in Officers Skaggs's and Kent's approach of Kennedy or Kennedy's car. Kennedy argues that two police cars pulling up and parking behind his car was a show of authority. But neither policeman used his lights or siren, nor did they block the driveway when parking their cars. Kennedy was not "boxed in" and could have driven away. *See Hughes v. State*, 337 S.W.3d 297, 302 (Tex. App.—Texarkana 2011, no pet.). The flashlights used by the policemen were not

used in any threatening manner, and no weapon was drawn. Kennedy argues that five police officers approached him at about the same time and that a reasonable person in his situation would have therefore concluded that he had been seized. But, the evidence shows that while five police officers were present at the scene, they did not all approach Kennedy. Kennedy himself testified that other than Officers Skaggs and Kent, the additional officers never approached him in any way while he was in his vehicle. Furthermore, when asked if the officers did "anything threatening or anything like that," Kennedy replied, "No."

Kennedy also argues that the policemen showed their authority such that the encounter was not consensual because they stood close to his vehicle, asked him questions like whether he had been "handled for anything illegal," and took his identification and ran a records check on him. But no justification is required for an officer to ask questions of an individual and even to ask to examine the individual's identification, as long as the police do not convey a message that compliance with their requests is required. *Florida v. Bostick*, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Here, the trial court could have found that Officer Skaggs did not demand Kennedy's identification but instead asked Kennedy for his identification and assured Kennedy that he had done nothing wrong. Furthermore, Kennedy's acquiescence to Officer Skaggs's request did not cause the encounter to lose its consensual nature. *See Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762-63, 80 L.Ed.2d 247 (1984). And although Kennedy testified that he felt like he was not free to leave, his subjective belief is not a factor. *See California v.*

*Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) ("… the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.").

Viewing the totality of the circumstances in the light most favorable to the trial court's implicit findings and ruling, we hold that the initial contact between Kennedy and Officers Skaggs and Kent was a consensual encounter, not a detention. When we consider this holding along with the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court could have implicitly found that Officer Skaggs observed what appeared to be crack cocaine in plain view during the consensual encounter. Kennedy does not dispute that the officer's observation was at least reasonable suspicion to detain him. The trial court, therefore, did not err in overruling Kennedy's motion to suppress. We overrule Kennedy's first issue.

### Jury Charge

In his second issue, Kennedy contends that the trial court abused its discretion by failing to give an Article 38.23 jury charge instruction on whether a reasonable person in his situation would have felt free to leave. The State responds that Kennedy was not entitled to the Article 38.23 instruction because, among other things, he failed to establish the requirements under *Madden*.

A claim of jury-charge error is reviewed using the procedure set out in *Almanza*. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The first step is to determine whether there is error in

the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Only if we find error, do we then analyze that error for harm. *Id.*

Article 38.23(a) of the Code of Criminal Procedure states:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). In *Madden*, the court of criminal appeals stated that a defendant's right to the submission of jury instructions under Article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible. *Madden v. State*, 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2007).

There are three requirements that a defendant must meet before he is entitled to the submission of a jury instruction under Article 38.23(a):

(1) The evidence heard by the jury must raise an issue of fact;

(2) The evidence on that fact must be affirmatively contested; and

(3) That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence.

There must be a genuine dispute about a material fact. If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law. And if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the

> disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence. The disputed fact must be an essential one in deciding the lawfulness of the challenged conduct.

*Id.* at 510-11.

Kennedy argues in his brief, "The factual question the jury should have been allowed to decide is whether a reasonable person in Appellant's situation would have felt free to leave." But whether a reasonable person in Kennedy's situation would have felt free to leave is not a material *factual* dispute. It is essentially a question of whether the facts surrounding the police officers' contact with Kennedy constituted a consensual encounter or an investigatory detention, which is a question of law.[2] *See Woodard*, 341 S.W.3d at 411 ("Generally, however, when an officer through force or a showing of authority restrains a citizen's liberty, the encounter is no longer consensual. This is the point at which an encounter becomes a detention or arrest, both of which are seizures under the Fourth Amendment." (citation omitted)); *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011) (whether facts surrounding police-defendant's interaction constitute consensual encounter or Fourth Amendment detention is subject to de novo review); *see also Johnson v. State*, No. 01-10-00134-CR, 2011 WL 5428969, at *5 (Tex. App.—Houston [1st Dist.] Nov. 10, 2011, pet. ref'd) (mem. op., not designated for publication) ("The question of whether a given set of historical facts constitutes a consensual police encounter or an investigatory detention is a question of law that we review de novo."). The trial court therefore did not err by not giving an Article 38.23

---

[2] This is further illustrated in Kennedy's brief because he details the facts that he contends support that he was not free to leave, *i.e.*, that he was detained, in contradiction to the officers' testimony that their approach of him was a consensual encounter and that he was free to leave.

jury charge instruction on whether a reasonable person in Kennedy's situation would have felt free to leave. *See Madden*, 242 S.W.3d at 510 ("The evidence heard by the jury must raise an issue of fact."). We overrule Kennedy's second issue.

In his third issue, Kennedy contends that the trial court abused its discretion by failing to give an Article 38.23 jury instruction on whether the police saw a baggie of cocaine in his hand before asking him to step out of his car and handcuffing him. The State responds that Kennedy failed to preserve this issue for review because he never raised any issue related to probable cause for his arrest or to whether the officer actually saw the crack cocaine in plain view and a general request for an Article 38.23 instruction was insufficient.

Whether a defendant preserved an issue for review is relevant only in determining the standard of review during harm analysis. *See Oursbourn v. State*, 259 S.W.3d 159, 178-81 (Tex. Crim. App. 2008); *Pickens v. State*, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005) (citing *Thomas v. State*, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986)). We must therefore first determine whether there is error in the charge based on Kennedy's issue. *See Ngo*, 175 S.W.3d at 743.

We believe that whether the police saw a baggie of cocaine in Kennedy's hand before asking him to step out of his car and handcuffing him was a material contested factual issue. Officer Skaggs testified that, during the records check, he noticed Kennedy's hand covering up what appeared to be crack cocaine in a plastic baggie in a Styrofoam food container in Kennedy's lap. Kennedy contested this statement by testifying that he knew that Officer Skaggs had not seen the drugs in his lap when he

asked him to get out of the car because the drugs were not on his lap. And whether Officer Skaggs made the observation is material because it provided the reasonable suspicion for him to remove Kennedy from his vehicle and detain him.

We thus conclude that the trial court did err by failing to include in the jury charge an Article 38.23 jury instruction on whether the police saw a baggie of cocaine in Kennedy's hand before asking him to step out of his car. But because Kennedy did not object to the charge on this basis, error will not result in reversal of his conviction in the absence of "egregious harm." *Almanza*, 686 S.W.2d at 171. In examining the record for egregious harm, we consider the entire jury charge, the state of the evidence, the final arguments of the parties, and any other relevant information revealed by the record of the trial as a whole. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007); *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006).

At trial, both Officers Skaggs and Kent testified that marijuana, heroin, pills, and crack cocaine were ultimately found in the Styrofoam food container that Kennedy had in his lap. A forensic scientist with the Texas Department of Public Safety Crime Laboratory confirmed that the crack cocaine and heroin identified by the officers did, in fact, test positive for cocaine and heroin. Although Kennedy claimed that Officer Skaggs could not have seen the drugs in his lap because they were not there, in a telephone call Kennedy made from the back of the patrol car (State's Exhibit No. 9),

Kennedy said that after the officers had walked up to his car, he had tried to put the drugs in a paper towel where he was eating and then inside a plastic container but that the officers had eventually found them. Kennedy also testified at trial that he was not denying the fact that the police found drugs that he was in possession of that night.

It is therefore unlikely that the jury would have disbelieved Officer Skaggs when he said that, during the records check, he noticed Kennedy's hand covering up what appeared to be crack cocaine in a plastic baggie in a Styrofoam food container in Kennedy's lap and instead believed Kennedy that the crack cocaine was not in his lap. Accordingly, we conclude that Kennedy was not egregiously harmed by the trial court's failure to, *sua sponte*, include in the jury charge an Article 38.23 jury instruction on whether the police saw a baggie of cocaine in Kennedy's hand before asking him to step out of his car. We overrule Kennedy's third issue.

Having overruled all three of Kennedy's issues, we affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
    (Chief Justice Gray concurs with a note)*
Affirmed
Opinion delivered and filed August 14, 2014
Do not publish
[CRPM]

*(Chief Justice Gray concurs in the judgment only.  A separate opinion will not follow.)